**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| JACK WEAVER, derivatively on behalf of TACTILE SYSTEMS TECHNOLOGY, INC., <br><br> Plaintiff, <br><br> v. <br><br> BRENT MOEN, WILLIAM BURKE, PETER SODERBERG, RAYMOND O. HUGGENBERGER, RICHARD NIGON, KEVIN H. ROCHE, LYNN BLAKE, GERALD R. MATTYS, ROBERT FOLKES, and BRYAN F. RISHE, <br><br> Defendants, <br><br> -and- <br><br> TACTILE SYSTEMS TECHNOLOGY, INC., <br><br> Nominal Defendant. | Case No. 1:22-cv-01063-GBW |

## VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Jack William Weaver ("Plaintiff"), by and through his undersigned attorneys, derivatively and on behalf of Nominal Defendant Tactile Systems Technology, Inc. ("Tactile" or the "Company"), files this Verified Amended Shareholder Derivative Complaint against Individual Defendants Brent Moen, William Burke, Peter H. Soderberg, Raymond O. Huggenberger, Richard Nigon, Kevin H. Roche, Lynn Blake, Gerald R. Mattys, Robert Folkes, and Bryan F. Rishe (collectively, the "Individual Defendants") for violations of Section 14 of the Securities Exchange Act of 1934 (the "Exchange Act"); breaches of their fiduciary duties as directors and/or officers of Tactile including the recovery of most insider trading profits; unjust enrichment; to void their compensation awards; and for contribution under Sections 10(b) and

21D of the Exchange Act.

Except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge, Plaintiff's information and belief as to all other matters is based upon, among other things, investigations conducted by Plaintiff's counsel, which included, *inter alia*, review, and analysis of (i) Tactile's books and records it produced to Plaintiff pursuant to 8 Del. C. § 220; (ii) United States Securities and Exchange Commission ("SEC") regulatory filings made by and regarding Tactile; (iii) Defendants' public documents, announcements, conference calls, wire and press releases; (iv) pleadings, papers, any documents filed with, and publicly available from the related securities fraud class action: *Brian Mart, Individually and on Behalf of All Others Similarly Situated v. Tactile Systems Technology, Inc., et al.*, No. 0:20-cv-02074-NEB-BRT (D. Minn. 2020), ("Mart" or the "Securities Class Action")[1], the *Mart* court holdings in its partial denial of defendants' motion to dismiss the *Mart* Action; (v) pleadings, papers, any documents filed with, or evidence submitted in, and publicly available from the qui tam action in *United States ex rel. Veterans First Medical Supply, LLC* v. *Tactile Systems Technology, Inc., et al.*, Case No. 4:18-cv-02871 (S.D. Tex. 2020) (the "Qui Tam Action"); (vi) pleadings, papers, any documents filed with, or evidence submitted in, and publicly available from the federal discrimination action in *Sempowich v. Tactile Medical Systems, Inc.*, Case No. 5:18-cv-00488-D; (vii) documents provided through the FOIA requests; and (ix) other publicly available and readily obtainable information and media on the Internet, in print, or other medium, including news and analyst reports and advisories, concerning Tactile.

---

[1] On March 31, 2022, the *Mart* court granted in part and denied in part, the Securities Class Action Defendants' Motion to Dismiss. *See* Securities Class Action ECF No. 81.

## I.    **NATURE OF THE ACTION**

1.    This is a shareholder derivative action brought in the right, and for the benefit, of Tactile against certain of its officers and directors arising out of the Individual Defendants' conduct from May 7, 2018 through June 8, 2020 (the "Relevant Period") seeking to recover insider trading profits and compensation performance awards to officers and directors' compensation and to seek damages to Tactile arising out of Defendants' violations of statutory and common law fiduciary duties that have occurred which have caused, and continue to cause, substantial harm to Tactile and its shareholders, including monetary losses and damages to Tactile's business, assets, reputation and goodwill.  During the Relevant Period, Defendants made false and misleading statements in Proxy Statements soliciting shareholder votes for their election as directors which earned them excessive compensation.  Defendants also made and/or signed materially false and misleading statements to investors including in reports on Forms 10-Qs and 10-Ks filed during the Relevant Period that exposed Tactile to liability and inflated Tactile's stock price thus allowing insiders to enjoy illegal insider trading profits. Defendants also allowed Tactile to engage in illegal referral practices which exposed Tactile to liability and/or government sanctions that have cost Tactile tens of millions of dollars and lost reimbursements.

2.    Tactile is a medical technology company focused on developing medical devices for the treatment of chronic diseases.   Tactile specializes in vascular disease, treating lymphedema and chronic venous insufficiency ("CVI").  Lymphedema is the accumulation of fluid in soft body tissues because of a damaged or clogged lymph system. CVI is when the venous wall and/or valves in the veins do not function properly, obstructing blood flow back to the heart.

3.    Tactile's chief product is the Flexitouch System, an at-home solution for lymphedema and CVI patients.  Flexitouch System mimicked the clinic-based manual lymphatic

drainage therapy through a self-applied treatment solution. When compared to standard therapies, the Flexitouch System improved quality of life and delivered considerable cost savings to payers and patients.

4.    This case stems from Tactile's sales and marketing practices in connection with its Flexitouch product sales to Lymphedema and CVI patients. Medical device companies like Tactile who sell to patients covered by the government reimbursement programs are regulated by the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320 and the False Claims Act ("FCA"), 31 U.S.C. § 3729 and other regulations. During the Relevant Period, Tactile has been making illegal referral payments to trainers and doctors (*i.e.*, "Key Opinion Lenders" or "KOL") in exchange for steering Flexitouch business to Tactile. Tactile was "incorrectly" certifying compliance with the government agency resolutions, including the medical necessity certification, in order to qualify for reimbursement. In public statements, Defendants made false representations about Tactile's business, the risks it faced from the Qui Tam action, its illegal referral practice, and the size of the market for the Flexitouch System. Insiders simultaneously regularly unloaded tens of millions of dollars of Tactile stock throughout the Relevant Period.

5.    The Flexitouch was, and is, Tactile's "core product." Its sales generated 92% of Tactile's revenues in 2017 and 2018, 88% in 2020, and 85% in 2021. In particular, the Flexitouch system generated $131.9 million, or 92% of revenue, in 2018 and $100.3 million, or 92% of revenue, in 2017. *See* 2018 10-K. The Flexitouch generated $176.2 million, or 85% of revenue, in 2021 and $163.9 million, or 88% of revenue, in 2020. *See* 2021 10-K. Tactile has also confirmed that its "revenue is primarily generated from our Flexitouch System, and we are therefore highly dependent on one product." *See* 2021 10-K.

6.     The concealment of Tactile's referral payment marketing practices, (*i.e.*, kickback schemes) and the practice of "pre-filling" prescription forms and overstating Tactile's Medicare and VA revenues rendered materially misleading statements about (a) Tactile's revenues; (b) "direct-to-patient model"; (c) Tactile's compliance with the law; (d) subjects required to be disclosed in Item 303 in SEC filings; and (e) risks to Tactile presented by the Qui Tam suit and the illegal practices during the Relevant Period.  Additionally, Tactile's statements about its total addressable market ("TAM") in 2018 and 2019 were materially false and misleading and, together with other misrepresentations, inflated the price of Tactile common stock.  All of these materially false and misleading statements were made throughout 2018, 2019 and 2020.

7.     As the stock price soared on Defendants' materially false and misleading statements—driven by Defendants concealed illegal schemes, Company insiders took advantage of the artificially inflated stock price and sold more than $38 million of their Tactile shares during the Relevant Period at prices from approximately $45 to as high as $74 per share.  By the end of 2020, as previously concealed facts about Tactile's business became known, Tactile's stock price began its decline to its current price of approximately $14 per share.

8.     The corporate misconduct by Defendants alleged in the Qui Tam Action, the Securities Action, and the wrongdoing alleged herein has subjected the Company to investigations, losses from the waste of corporate assets, and to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and through illegal insider trading profits.

9.     On March 31, 2022, the Honorable Nancy E. Brasel, for United States District Court of Minnesota, issued an order ("Securities Class Action Order") denying Tactile's Motion

to Dismiss the Securities Class Action.  In denying the motion to dismiss and issuing the Securities Class Action Order, Judge Brasel held:

- These allegations, viewed as a whole, give rise to a strong inference of scienter as to Mattys, Folkes, Rishe, Burke, Nigon, and Roche for the alleged misstatements about Tactile's revenue, compliance with the law, and SEC Regulation Item 303. And Mattys allegedly made misstatements about Tactile's 2018 and 2019 TAM. (*E.g.*, Compl. ¶¶ 159, 195.) The allegations of scienter as to Mattys and Folkes are enough to impute scienter to Tactile. *See St. Jude*, 836 F. Supp. 2d at 896 ("The knowledge and scienter of a corporate officer such as its CEO or CFO may of course be imputed to the corporate entity.").

- "Plaintiff asserts that Rishe, who as Tactile's SVP of Sales, directed the sales team to use the KOL program, and that Rishe, Folkes, and Mattys were deeply involved in Flexitouch sales, setting sales quotas, sales managers salaries, and closely monitoring Tactile representatives' sales of the Flexitouch. (Pl's Br. at 32 n.18 (citing Compl. ¶¶ 18, 37, 251–66).) The Court finds that these complaint allegations—which are incorporated into Count II—sufficiently allege scheme liability as to Rishe, Folkes, and Mattys."

- "During the Class Period, Folkes was Tactile's COO and Rishe was its SVP of Sales. (Compl. ¶¶ 17–18.) Folkes and Rishe were also allegedly "core members of management . . . who determined [Tactile's] sales strategy." (*Id.* ¶ 258; *see id.* ¶¶ 257–66 (alleging how Mattys, Folkes, and Rishe determined Flexitouch sales strategy); *see also id.* ¶ 296 (alleging each individual defendant "had the power to influence and control and did influence and control, directly and indirectly, the

decision-making of [Tactile]").) These allegations suffice under the notice pleading standard. *See, e.g.*, *CenturyLink*, 403 F. Supp. 3d at 737 (finding plaintiffs sufficiently alleged a § 20(a) claim against SVP of operations transformation and treasurer who allegedly exercised control over the corporation's general operations and had "'the power to determine the specific acts' giving rise to the claim") (citation omitted)."

- "The Complaint also alleges that Rishe touted the KOL program at Tactile's 2018 National Sales Meeting, well before entering into the 10b5-1 plan for the December 10, 2019 sale in November 2019. (Compl. ¶¶ 37, 234–36.) These allegations sufficiently allege that Rishe possessed the requisite material, nonpublic information" for insider trading.

- "The Complaint alleges that individual Defendants (including Rishe) violated Section 10(b) of the Exchange Act."

10.     As a result of the Securities Class Action Order, Tactile is now poised to settle the Securities Class Action for $5,000,000.[2]

11.     At the time of filing the original complaint on May 24, 2022, Tactile had a seven-member board: (1) William Burke, (2) Raymond Huggenberger, (3) Daniel Reuvers, (4) Sheri

---

[2] *See* PROPOSED ORDER TO JUDGE re 144 MOTION for Approval of Settlement for Preliminary Approval filed by St. Clair County Employees' Retirement System.(Price, Ashley) (Entered: 02/28/2023) Docket Entry No. 149 ("the proposed settlement (the "Settlement") of the above-captioned action as set forth in the Stipulation of Settlement ("Stipulation") for $5,000,000 in cash should be approved by the Court as fair, reasonable, and adequate."); *see also* Tactile 2022 10-K filed on February 21, 2023 for year ending December 31, 2022 ("On November 21, 2022, the company announced that it entered a Memorandum of Understanding to settle this matter. The Company does not expect to fund any portion of cash payments made in connection with the $5 million settlement amount.).

Dodd, (5) Deepti Jain, (6) Valerie Asbury, and (7) Brent Shafer (collectively the "Demand Board").

1. Current Director Defendant and Demand Board member William Burke joined the board in 2015 and is alleged herein and, in the Securities Class Action, to have breached his fiduciary duties illegally and sold Tactile stock while in possession of material adverse information and unlawful profited thereby.

2. Current Director Defendant and Demand Board member Raymond Huggenberger joined the board in 2017 and is alleged to have breached his fiduciary duties when he signed materially false and misleading SEC filings during the time of the insider selling and/or alleged Anti-Kickback Statute and the False Claims Act violations.

3. Demand Board member Daniel Reuvers joined the board on or about May 22, 2020 and as CEO is not independent.

4. Demand Board member Sheri Dodd joined the board on or about Jan. 5, 2021, before the Securities Class Action was filed and when the Securities Class Action Order was issued, and demand is futile as to Dodd since she did not remain neutral and took no action on the Securities Class Action, implicitly endorsing the wrongdoing alleged herein.

5. Demand Board member Deepti Jain joined the board on or about Jan. 5, 2021, before the Securities Class Action was filed and when the Securities Class Action Order was issued, and demand is futile as to Jain since she did not remain neutral and took no action on the Securities Class Action or the Securities Class Action Order, implicitly endorsing the wrongdoing alleged herein.

6.   Demand Board member Valerie Asbury joined the board on or about Jan. 5, 2022, while the Securities Class Action was pending and when the Securities Class Action Order was issued and demand is futile as to Asbury since she did not remain neutral and took no action on the Securities Class Action or the Securities Class Action Order, implicitly endorsing the wrongdoing alleged herein.

7.   Demand Board member Brent Shafer joined the board on or about Jan. 5, 2022, while the Securities Class Action was pending and when the Securities Class Action Order was issued and demand is futile as to Shafer since he did not remain neutral and took no action on the Securities Class Action or the Securities Class Action Order, implicitly endorsing the wrongdoing alleged herein.

12.   There is no indication any Demand Board member has taken any steps to investigate the Securities Class Action. The Demand Board appears steadfast in its commitment to defend the wrongdoing alleged herein as evidenced by Tactile's 2022 10-K signed by the Demand Board stating "[w]e are defending the action as it proceeds" and directing Tactile itself to join the motion to dismiss this action on the merits.[3] The Demand Board's decision to take no action with respect to the Securities Class Action and prejudge the claims herein without considering an investigation is therefore not protected by the business judgment rule.

13.   Delaware law treats a conscious failure to act as the equivalent of action, so if a plaintiff brings a clear violation to the directors' attention and they do not act, then it is reasonably conceivable that the directors' conscious inaction constitutes a breach of duty. At the very least,

---

[3] Tactile's 2022 10-K filed with the SEC on February 21, 2023 was signed by the Demand Board plus recent board member addition Carmen Volkart who joined the Tactile Board on January 5, 2023.

the Demand Board had and has a fiduciary duty to take a neutral position and consider conducting an unbiased investigation, especially when faced with the Securities Class Action Order.

14.    Demand upon the board, pursuant to Delaware law, is therefore excused as Tactile does not have a majority of disinterested and independent directors.

15.    The Securities Class Action Order's holdings regarding: (i) a "strong inference of scienter;" (ii) unusual timing and quantity of insider trading by certain defendants; (iii) holdings sustaining Rule 10b-5 claims based on misleading Item 303 disclosures in 10Ks and 10Qs issued during the Class Period which were signed by, *inter alia*, demand Director Defendant Huggenberger, and (iv) holdings sustaining allegations that Tactile's Board was informed of the "kickback" business model allegations support a breach of fiduciary duty and support evidence of demand futility with respect to the Demand Board for a failure to act.

16.    The Tactile 10-K filed on February 21, 2023 for the annual period ending 2022 proves the Demand Board failed to take action, including an internal investigation of the acts and/or misconduct described in the Qui Tam action or the Securities Action because it is bereft of any details or information explanation as to whether the Demand Board investigated or appointed any independent committee to investigate the Securities Class Action allegations.

17.    Additionally, even after replacing former officers or directors who were alleged or determined to have engaged in insider trading in the Securities Class Action Order, the Demand Board failed to properly update and strengthen Tactile's insider trading policies as recently recommended by the SEC or seek to recoup insider trading profits.[4]

---

[4] *See* https://www.sec.gov/rules/final/2022/33-11138.pdf; *see also* Tactile 2023 10-K filed on February 21, 2023 (omitting any reference to insider trading policy or 10b5-1 plans or updates).

18.     Furthermore, the Demand Board has not announced any effort to act on the Company's "Incentive Compensation Recovery Policy" which allows Tactile's board to "require reimbursement or forfeiture of all or a portion of any incentive compensation awarded to an Executive of the Company after the date of adoption of this policy where the committee has determined that (a) ". . . there has been misconduct resulting in either a violation of law or of Company policy that has caused significant financial or reputational harm to the Company; and (b) either the Executive committed the misconduct or failed in his or her responsibility to manage or monitor the applicable conduct or risk." The Demand Board have thus implicitly judged that they will not take action against their fellow directors.  Demand is therefore futile.

## II.     <u>JURISDICTION AND VENUE</u>

19.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Sections 14 of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

21.     This Court has jurisdiction over each defendant named herein because each is either a corporation that conducts business in and maintains operations in this District, is an individual residing in this District, and/or is an individual non-resident who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the district court permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Tactile is incorporated in this District; (ii) one or more of the Defendants either resides in or maintains offices in this District; (iii) a substantial portion of the transactions and wrongs

complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

### III.    PARTIES

#### A.    Plaintiff

23.    Plaintiff, Jack Weaver ("Plaintiff"), is a current shareholder of Tactile common stock, has continuously held these shares of Tactile common stock during the Relevant Period, and will continue to hold these shares during the pendency of this litigation.

#### B.    Defendants

##### 1.    Nominal Defendant

24.    Nominal Defendant, Tactile, is a Delaware corporation with principal executive offices located in Minneapolis, Minnesota.

25.    Tactile's shares trade on the NASDAQ under the ticker symbol "TCMD."

##### 2.    Defendant Moen

26.    Defendant Brent Moen ("Moen") was appointed as the Company's Chief Financial Officer ("CFO") on September 8, 2018, and remained CFO through the Relevant Period.

27.    In that capacity, Moen signed and/or issued materially false and misleading statements in SEC filings by Tactile identified in this Complaint.

28.    According to the Company's Schedule 14A filed with the SEC on April 5, 2020 (the "2021 Proxy Statement") for the fiscal year ended December 31, 2019, and 2018, Defendant Moen received compensation of $905,566 and $953,241 respectively in those years.

### 3. Defendant Burke

29.　　Defendant William Burke ("Burke") has been a director since 2015 and served on the Audit Committee and Compensation and Organization Committee at all relevant times (2015-Present).

30.　　In that capacity, Burke signed and/or issued materially false and misleading statements in SEC filings by Tactile identified in this Complaint.

31.　　For the fiscal years ended December 31, 2020, December 31, 2019, and December 31, 2018. Defendant Burke received compensation of $199,966, $189,975 and $183,201 respectively from the Company.

32.　　During the Relevant Period, Defendant Burke made the following sales of Company stock while in possession of material adverse, non-public information ("MNPI"):

| Sale Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 5/14/2018 | $45.86 | 700 | $32,102 |
| 8/9/2018 | $58.74 | 5,000 | $293,700 |
| 5/14/2019 | $52.65 | 412 | $21,692 |
| 6/18/2019 | $55.00 | 10,000 | $550,000 |
| 5/13/2020 | $49.94 | 550 | $27,467 |
| Relevant Period Total | | 16,662 | $924,961 |

### 4. Defendant Soderberg

33.　　Defendant Peter Soderberg ("Soderberg") was a director of Tactile during the Relevant Period and has served on the Nominating and Corporate Governance Committee during relevant times. In 2018 and 2019, he was Chairman of the Board.

34.　　In that capacity, Soderberg signed and/or issued materially false and misleading statements in SEC filings by Tactile identified in this Complaint.

35.     For the fiscal years ended December 31, 2020, December 31, 2015, and December 31, 2018, Defendant Soderberg received compensation of $229,966, $219,975 and $173,201.00 respectively from the Company.

### 5. **Defendant Huggenberger**

36.     Defendant Raymond O. Huggenberger ("Huggenberger") is and has been a director of Tactile during the Relevant Period and has served on the Compensation and Organization Committee and Compliance and Reimbursement Committee at all relevant times (2017-Present).

37.     In that capacity, Huggenberger signed and/or issued materially false and misleading statements in SEC filings by Tactile.

38.     For the fiscal years ended December 31, 2020, and December 31, 2019, Defendant Huggenberger received compensation of $187,466 and $177,475 respectively, from the Company.

### 6. **Defendant Nigon**

39.     Defendant Richard Nigon ("Nigon") was a director of Tactile during the Relevant Period and served on the Audit Committee and Nominating and Corporate Governance Committee during relevant times.

40.     In that capacity, Nigon signed and/or issued materially false and misleading statements in SEC filings by Tactile.

41.     For the fiscal years ended December 31, 2020, and December 31, 2019, Defendant Nigon received compensation of $199,966 and $189,975 respectively, from the Company.

42.     During the Relevant Period, Defendant Nigon made the following sales of Company stock while in possession of MNPI:

| Sale Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 5/15/2019 | $50.33 | 15,000 | $754,950 |
| 9/4/2019 | $49.35 | 39 | $1,925 |
| 9/5/2019 | $49.35 | 1,900 | $93,765 |
| 9/9/2019 | $49.30 | 5,354 | $263,952 |
| 9/10/2019 | $49.92 | 4,583 | $228,783 |
| Relevant Period Total | | 26,876 | $1,343,375 |

### 7. Defendant Roche

43.    Defendant Kevin H. Roche ("Roche") was a director of Tactile during the Relevant Period and has served on the Audit Committee and Compliance and Reimbursement Committee during relevant times.

44.    In that capacity, Roche signed and/or issued materially false and misleading statements in SEC filings by Tactile identified in this Complaint.

45.    For the fiscal years ended December 31, 2020, December 31, 2019, and December 31, 2018, Defendant Roche received compensation of $194,966, $184,975 and $179,201 respectively in compensation from the Company.

46.    During the Relevant Period, Defendant Roche made the following sales of Company stock while in possession of MNPI:

| Sale Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 5/10/2018 | $44.41 | 15,000 | $666,150 |
| 8/9/2018 | $58.19 | 1,134 | $65,987 |
| 8/9/2018 | $59.25 | 1,645 | $97,466 |
| 8/10/2018 | $57.37 | 12,221 | $701,119 |
| 5/10/2019 | $57.25 | 10,093 | $577,824 |
| 5/30/2019 | $50.00 | 4,907 | $245,350 |
| 8/22/2019 | $50.87 | 5,000 | $254,350 |
| Relevant Period Total | | 50,000 | $2,608,247 |

**8. Defendant Pegus**

47.    Defendant Cheryl Pegus ("Pegus") served as a director of Tactile from 2017 until December 31, 2020.

48.    In that capacity, Pegus signed and/or issued materially false and misleading statements in SEC filings by Tactile identified in this Complaint.

49.    For the fiscal year ended December 31, 2018, and December 31, 2019, Pegus received $179,201 and $177,475 in compensation from Tactile.

**9. Defendant Blake**

50.    Defendant Lynn Blake ("Blake") served as the Company's Chief Financial Officer from June 2016 to September 8, 2018. On August 1, 2018, Defendant Blake informed the Company of her intent to resign due to "personal reasons."

51.    In that capacity Blake signed and/or issued materially false and misleading statements in SEC filings by Tactile identified in this Complaint.

52.    During the Relevant Period, Defendant Blake made the following sales of Company stock while in possession of MNPI:

| Sale Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 5/15/2018 | $44.95 | 556 | $24,992 |
| 7/31/2018 | $48.08 | 766 | $36,829 |
| 8/16/2018 | $57.04 | 5,000 | $285,200 |
| Relevant Period Total | | 6,322 | $347,021 |

**10. Defendant Mattys**

53.    Defendant Gerald R. Mattys ("Mattys") has served as the Company Chief Executive Officer ("CEO") from 2005 to June 2020 and was a director during the Relevant Period. On January 10, 2020, Defendant Mattys informed the Company of his intent to retire and was subsequently replaced by Daniel Ruevers on June 8, 2020.

54.     In that capacity, Mattys signed and/or issued materially false and misleading statements in SEC filings by Tactile identified in this Complaint and in public forums.

55.     During the Relevant Period, Defendant Mattys made the following sales of Company stock while in possession of MNPI:

| Sales Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 6/26/2018 | $54.27 | 14,210 | $771,177 |
| 6/26/2018 | $54.67 | 5,790 | $316,539 |
| 7/17/2018 | $55.01 | 931 | $51,214 |
| 7/17/2018 | $54.48 | 24,069 | $1,311,279 |
| 8/21/2018 | $61.99 | 3,221 | $199,670 |
| 8/21/2018 | $63.02 | 2,337 | $147,278 |
| 9/17/2018 | $66.52 | 5,450 | $362,534 |
| 9/17/2018 | $67.13 | 1,530 | $102,709 |
| 9/17/2018 | $68.46 | 3,000 | $205,380 |
| 9/17/2018 | $65.34 | 11,118 | $726,450 |
| 10/22/2018 | $64.99 | 7,900 | $513,421 |
| 10/22/2018 | $63.67 | 13,386 | $852,287 |
| 10/22/2018 | $64.38 | 17,714 | $1,140,427 |
| 11/19/2018 | $56.27 | 3,000 | $168,810 |
| 11/19/2018 | $57.98 | 800 | $46,384 |
| 11/19/2018 | $55.53 | 14,469 | $803,464 |
| 2/14/2019 | $70.66 | 21,803 | $1,540,600 |
| 2/14/2019 | $69.50 | 11,245 | $781,528 |
| 2/14/2019 | $71.43 | 3,070 | $219,290 |
| 2/15/2019 | $69.97 | 12,408 | $868,188 |
| 2/15/2019 | $70.47 | 1,474 | $103,873 |
| 3/1/2019 | $69.54 | 3,400 | $236,436 |
| 3/1/2019 | $72.53 | 4,840 | $351,045 |
| 3/1/2019 | $73.33 | 5,068 | $371,636 |
| 3/1/2019 | $71.71 | 2,875 | $206,166 |
| 3/1/2019 | $70.33 | 9,819 | $690,570 |
| 3/1/2019 | $74.58 | 1,300 | $96,954 |
| 12/23/2019 | $69.85 | 30,000 | $2,095,500 |
| 3/5/2020 | $48.49 | 560 | $27,154 |
| 4/28/2020 | $54.95 | 100 | $5,495 |
| 4/29/2020 | $55.48 | 28,115 | $1,559,820 |
| 4/29/2020 | $56.14 | 11,785 | $661,610 |

| Relevant Period Total | | 276,787 | $17,534,888 |
|---|---|---|---|

56.     During 2018 and 2019, Defendant Mattys was paid $2,053,404 and $2,806,312 in total compensation.

### 11. Defendant Folkes

57.     Defendant Robert J. Folkes ("Folkes") was Tactile's Chief Operating Officer from February 2015 to September 2020 and has served as Company's CFO from February 2005 to April 2016.

58.     In that capacity, Folkes signed and/or issued materially false and misleading statements in SEC filings by Tactile identified in this Complaint.

59.     During the Relevant Period, Defendant Folkes made the following sales of Company stock while in possession of MNPI:

| Sale Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 5/18/2018 | $46.05 | 2,482 | $114,296 |
| 6/1/2018 | $49.78 | 3,044 | $151,530 |
| 6/18/2018 | $55.92 | 1,082 | $60,505 |
| 6/18/2018 | $55.32 | 1,400 | $77,448 |
| 7/2/2018 | $51.50 | 3,043 | $156,715 |
| 7/18/2018 | $54.55 | 2,482 | $135,393 |
| 8/1/2018 | $47.54 | 3,043 | $144,664 |
| 8/17/2018 | $57.95 | 2,482 | $143,832 |
| 9/4/2018 | $67.25 | 2,000 | $134,500 |
| 9/4/2018 | $67.77 | 1,044 | $70,752 |
| 9/10/2018 | $70.05 | 5,000 | $350,250 |
| 9/18/2018 | $64.73 | 2,482 | $160,660 |
| 10/1/2018 | $71.54 | 3,044 | $217,768 |
| 10/18/2018 | $65.82 | 2,483 | $163,431 |
| 11/1/2018 | $65.29 | 3,043 | $198,677 |
| 11/27/2018 | $54.07 | 2,067 | $111,763 |
| 11/27/2018 | $53.35 | 12,248 | $653,431 |
| 11/28/2018 | $52.58 | 7,535 | $396,190 |
| 11/28/2018 | $54.21 | 240 | $13,010 |
| 11/28/2018 | $53.39 | 1,100 | $58,729 |

| 12/3/2018 | $56.27 | 3,043 | $171,230 |
|---|---|---|---|
| 1/2/2019 | $45.42 | 3,044 | $138,258 |
| 1/15/2019 | $59.49 | 2,500 | $148,725 |
| 1/17/2019 | $60.85 | 2,500 | $152,125 |
| 2/1/2019 | $66.04 | 3,044 | $201,026 |
| 2/11/2019 | $68.61 | 2,500 | $171,525 |
| 2/13/2019 | $70.22 | 2,500 | $175,550 |
| 3/1/2019 | $69.00 | 3,044 | $210,036 |
| 3/12/2019 | $70.36 | 2,500 | $175,900 |
| 3/14/2019 | $61.72 | 2,500 | $154,300 |
| 4/16/2019 | $52.45 | 2,500 | $131,125 |
| 4/18/2019 | $49.83 | 2,500 | $124,575 |
| 5/13/2019 | $53.25 | 1,574 | $83,816 |
| 5/13/2019 | $54.40 | 926 | $50,374 |
| 5/15/2019 | $51.52 | 100 | $5,152 |
| 5/15/2019 | $50.40 | 2,400 | $120,960 |
| 5/21/2019 | $50.00 | 10,607 | $530,350 |
| 6/11/2019 | $53.80 | 2,500 | $134,500 |
| 6/13/2019 | $52.75 | 2,500 | $131,875 |
| 6/20/2019 | $56.02 | 2,106 | $117,978 |
| 6/27/2019 | $52.38 | 2,106 | $110,312 |
| 7/11/2019 | $55.31 | 2,106 | $116,483 |
| 7/25/2019 | $55.17 | 506 | $27,916 |
| 7/25/2019 | $54.49 | 1,600 | $87,184 |
| 8/8/2019 | $51.13 | 2,106 | $107,680 |
| 8/22/2019 | $50.85 | 2,106 | $107,090 |
| 9/12/2019 | $50.11 | 2,106 | $105,532 |
| 9/26/2019 | $45.11 | 2,106 | $95,002 |
| 10/10/2019 | $42.29 | 2,106 | $89,063 |
| 10/24/2019 | $45.38 | 2,106 | $95,570 |
| 11/7/2019 | $51.27 | 2,106 | $107,975 |
| 11/21/2019 | $58.21 | 2,106 | $122,590 |
| 11/22/2019 | $60.12 | 2,273 | $136,653 |
| 12/12/2019 | $65.04 | 2,106 | $136,974 |
| 12/26/2019 | $71.04 | 127 | $9,022 |
| 12/26/2019 | $69.30 | 1,479 | $102,495 |
| 12/26/2019 | $70.40 | 500 | $35,200 |
| 1/9/2020 | $68.02 | 2,106 | $143,250 |
| 1/23/2020 | $57.21 | 2,106 | $120,484 |
| 2/6/2020 | $59.17 | 2,106 | $124,612 |
| 2/20/2020 | $63.62 | 2,106 | $133,984 |

| 3/5/2020 | $48.67 | 180 | $8,761 |
| Relevant Period Total | | 154,487 | $8,766,755 |

60.    In 2018 and 2019, Defendant Folkes was paid $887,245 and $893,899 in total compensation.

### 12. **Defendant Rishe**

61.    Defendant Bryan F. Rishe ("Rishe") became Tactile's Senior Vice President of Sales ("SVP") in December 2017 and remained so at all relevant times. Defendant Rishe retired on May 1, 2021, and was succeeded by Eric Paul.

62.    For the fiscal year ended December 31, 2020, Defendant Rishe received $1,276,918 in compensation from the Company. For the fiscal years 2018 and 2019 he received compensation of $989,371 and $957,574, respectively.

63.    During the Relevant Period, Defendant Rishe made the following sales of Company stock while in possession of MNPI:

| Sale Date | Price | Shares Sold | Proceeds |
| --- | --- | --- | --- |
| 5/21/2018 | $46.02 | 1,500 | $69,030 |
| 6/15/2018 | $54.77 | 900 | $49,293 |
| 6/15/2018 | $55.59 | 2,100 | $116,739 |
| 6/20/2018 | $55.69 | 1,500 | $83,535 |
| 7/16/2018 | $52.49 | 3,000 | $157,470 |
| 8/15/2018 | $57.48 | 2,900 | $166,692 |
| 8/15/2018 | $58.47 | 100 | $5,847 |
| 9/14/2018 | $68.63 | 2,476 | $169,928 |
| 9/14/2018 | $69.30 | 524 | $36,313 |
| 10/15/2018 | $61.72 | 3,000 | $185,160 |
| 11/15/2018 | $56.66 | 3,000 | $169,980 |
| 12/14/2018 | $51.22 | 3,000 | $153,660 |
| 1/15/2019 | $59.49 | 3,000 | $178,470 |
| 2/15/2019 | $69.44 | 3,000 | $208,320 |
| 3/15/2019 | $62.70 | 3,000 | $188,100 |
| 4/15/2019 | $52.98 | 3,000 | $158,940 |
| 5/15/2019 | $51.16 | 100 | $5,116 |

| 5/15/2019 | $50.39 | 2,900 | $146,131 |
| 6/10/2019 | $53.75 | 193 | $10,374 |
| 6/10/2019 | $53.25 | 4,619 | $245,962 |
| 6/25/2019 | $53.44 | 2,725 | $145,624 |
| 6/25/2019 | $54.31 | 2,087 | $113,345 |
| 7/10/2019 | $55.09 | 3,580 | $197,222 |
| 7/10/2019 | $55.78 | 1,233 | $68,777 |
| 7/25/2019 | $54.19 | 4,012 | $217,410 |
| 7/25/2019 | $54.92 | 800 | $43,936 |
| 8/12/2019 | $48.63 | 4,613 | $224,330 |
| 8/12/2019 | $49.69 | 200 | $9,938 |
| 8/26/2019 | $48.56 | 4,099 | $199,047 |
| 8/26/2019 | $48.98 | 713 | $34,923 |
| 9/10/2019 | $49.00 | 1,213 | $59,437 |
| 9/10/2019 | $48.59 | 3,600 | $174,924 |
| 9/25/2019 | $45.77 | 4,512 | $206,514 |
| 9/25/2019 | $46.30 | 300 | $13,890 |
| 10/10/2019 | $43.19 | 201 | $8,681 |
| 10/10/2019 | $42.62 | 4,612 | $196,563 |
| 10/25/2019 | $44.88 | 4,812 | $215,963 |
| 11/11/2019 | $51.75 | 2,713 | $140,398 |
| 11/11/2019 | $51.24 | 2,100 | $107,604 |
| 11/25/2019 | $62.05 | 1,157 | $71,792 |
| 11/25/2019 | $61.80 | 3,655 | $225,879 |
| 12/10/2019 | $64.23 | 4,813 | $309,139 |
| 12/23/2019 | $70.00 | 3,409 | $238,630 |
| 12/26/2019 | $70.81 | 305 | $21,597 |
| 12/26/2019 | $69.09 | 3,980 | $274,978 |
| 12/26/2019 | $70.04 | 527 | $36,911 |
| 1/10/2020 | $68.77 | 2,331 | $160,303 |
| 1/24/2020 | $58.19 | 2,330 | $135,583 |
| 2/10/2020 | $58.63 | 2,330 | $136,608 |
| 2/25/2020 | $55.75 | 2,330 | $129,898 |
| 3/5/2020 | $48.87 | 204 | $9,969 |
| 3/10/2020 | $43.75 | 2,330 | $101,938 |
| 3/25/2020 | $40.00 | 2,331 | $93,240 |
| 4/13/2020 | $47.26 | 2,330 | $110,116 |
| 4/27/2020 | $52.66 | 2,330 | $122,698 |
| 5/11/2020 | $49.22 | 2,330 | $114,683 |
| 5/26/2020 | $50.10 | 2,330 | $116,733 |
| Relevant Period Total | | 133,289 | $7,294,280 |

64.     Defendants Burke, Nigon, Roche, Blake, Mattys, Folks, and Rishe are referred to herein as the "Insider Selling Defendants."

65.     The Insider Selling Defendants collectively sold at least $38,819,527 worth of Tactile stock while in possession of MNPI.

**Non-Defendant Directors Upon Whom Demand is Futile**

    **1.  Daniel Reuvers**

66.     Daniel Reuvers ("Reuvers") has served as the Company's President, CEO, and director since June 2020, before the Securities Class Action was filed and throughout its pendency, and has decided not to take any action nor  investigate director and officer wrongdoing.

    **2.  Sheri Dodd**

67.     Sheri Dodd ("Dodd") has served as a director of the Company since January 2021, while the Securities Class Action was pending and before the Securities Class Action Order was issued, and has decided not to take any action nor  investigate director and officer wrongdoing.

    **3.  Deepti Jain**

68.     Deepti Jain ("Jain") has served as a director of the Company since January 2021, while the Securities Class Action was pending and before the Securities Class Action Order was issued, and has decided not to take any action nor investigate director and officer wrongdoing.

    **4.  Valerie Ashbury**

69.     Valerie Ashbury ("Ashbury") was appointed as a director in January 2022, while the Securities Class Action was pending and before the Securities Class Action Order was issued, and pre-judged not to take any action nor investigate director and officer wrongdoing.

    **5.  Brent Shafer**

70.     Brent Shafer ("Shafer") was recently appointed as a director in January 2022, while

the Securities Class Action was pending and before the Securities Class Action Order was issued, and pre-judged not to take any action nor investigate director and officer wrongdoing.

## IV.  DEFENDANTS' LEGAL DUTIES AND RESPONSIBILITIES

### A.  The Individual Defendants' Fiduciary Duties: Under Delaware Law

71.     By reason of their positions as officers, directors and/or fiduciaries of Tactile during the Relevant Period and because of their ability to control the business and corporate affairs of Tactile, the Individual Defendants, under Delaware law, owed Tactile and its shareholders' fiduciary obligations of trust, loyalty, good faith, and due care.  The Individual Defendants were and are required to use their utmost ability to control and manage Tactile in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Tactile and its shareholders to benefit all shareholders equitably.

72.     Each director and officer of the Company owes Tactile and its shareholders the fiduciary duty to exercise good faith and diligence and to do so loyally in the administration of the Company.

73.     As officers and directors of Tactile, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

74.     The officers and directors of Tactile were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties and formulate and implement systems for oversight and supervision.

75.     During the relevant period, as alleged herein the Individual Defendants at minimum knowingly acted with reckless disregard of their obligations as fiduciaries and their conduct posed a significant risk of harm to the Company.

76.    The Individual Defendants had a duty to prevent and correct the public dissemination of erroneous, misleading, and deceitful information concerning, inter alia, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospect.  As fiduciaries, the Individual Defendants had a duty to full, fair and accurate disclose in its regulatory filings with the SEC.

77.    The current board member defendants had and have a fiduciary duty to adequately investigate all shareholder demands for action and respond to the shareholder and to be fully informed before making any decisions to act or not act.  Plaintiff Weaver's action has tolled all applicable statutes of limitations and therefore the current board was free to evaluate the claims in this action and the Securities Class Action.

78.    Delaware law recognizes that conscious inaction represents as much of a decision as conscious action.[5]

79.    Each of the Individual Defendants further owed Tactile's and its shareholders the duty of loyalty requiring that each favor Tactile's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence,

---

[5] *See Garfield v. Allen*, 277 A.3d 296, 328 (Del. Ch. 2022) (citing *Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984) ("[A] conscious decision to refrain from acting may nonetheless be a valid exercise of business judgment and enjoy the protections of the rule.") (subsequent history omitted); *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *23 (Del. Ch. May 23, 2013) ("The Special Committee decided not to take any action with respect to the Audit Committee's termination of two successive outside auditors and the allegations made by Ernst & Young. The conscious decision not to take action was itself a decision."); *Krieger v. Wesco Fin. Corp.*, 30 A.3d 54, 58 (Del. Ch. 2011) ("Wesco stockholders had a choice: they could make an election and select a form of consideration, or they could choose not to make an election and accept the default cash consideration."); *Hubbard v. Hollywood Park Realty Enters.*, Inc., 1991 WL 3151, at *10 (Del. Ch. Jan. 14, 1991) ("From a semantic and even legal viewpoint, 'inaction' and 'action' may be substantive equivalents, different only in form."); Jean–Paul Sartre, Existentialism Is a Humanism 44 (Carol Macomber trans., Yale Univ. Press 2007) ("[W]hat is impossible is not to choose. I can always choose, but I must also realize that, if I decide not to choose, that still constitutes a choice.").

or knowledge of the affairs of the Company to gain personal advantage.

80.    At all times relevant hereto, the Individual Defendants were the agents of each other and Tactile and were at all times acting within the course and scope of such agency.

81.    The Individual Defendants had MNPI about the Company because of their advisory, executive, managerial, and directorial position with Tactile and under Delaware law were duty bound <u>not</u> to trade in Tactile stock while in possession of such MNPI.

**B.    Tactile's Corporate Governance**

**1.    Tactile's "Code of Conduct"**

82.    The Individual Defendants, like all employees, directors, and officers of the Company, are required to comply with Tactile's Code of Conduct (the "Code of Conduct"). The Code of Conduct states the following with respect to the responsibilities of the Board:

With regard to professional conduct, Representatives will practice:

- Integrity by maintaining an ongoing dedication to honesty and responsibility;

- Trustworthiness by acting in a reliable and dependable manner;

- Evenhandedness by treating others with impartiality;

- Respect by treating others with civility and decency;

- Stewardship by exercising custodial responsibility for Company intellectual, financial, and material assets and resources; by following federal and state laws and regulations and Company policies and procedures related to their duties and responsibilities; and

- Confidentiality by protecting the integrity and security of Company Information; such as patient records, employee files, confidential product and market information; and

- Reporting any activity reasonably believed to violate federal or state laws or regulations or Company Policies or Procedures to the Compliance Officer, CEO, CFO or a member of management

83.   Tactile's Code explicitly prohibited defendants from engaging in the sale of the Company's stock while in possession of material, nonpublic information. In particular, the Code stated:

> U.S. securities laws prohibit covered individuals from trading in the securities of a company on the basis of material non-public information. Covered individuals mean Company personnel, consultants and advisors, and related parties ("Covered Persons"). Material non-public information includes any information concerning a company's business, prospects, securities or market that an investor might consider important in deciding whether to buy or sell the securities of the company or that could affect the market price of the securities. Examples of material information include: possible mergers, acquisitions or divestitures, actual or estimated financial results, purchases and sales of investments in companies, obtaining or losing significant contracts, significant product developments, threatened major litigation or developments in such matters, and major changes in business strategies. Certain Covered Persons in the Company are identified as Corporate Insiders (directors and Section 16 officers of the Company and other officers and key employees of the Company and

84.   In addition, Tactile's Code stresses the importance of accurate disclosures. In pertinent part, it stated:

> It is the Company's policy that the information in our public communications, including filings and submissions with the Securities and Exchange Commission, be full, fair, honest, accurate, timely and understandable. All Representatives of the Company who are involved in our disclosure process are responsible for acting in furtherance of this policy. In particular, these individuals are required to maintain familiarity with the disclosure requirements applicable to the Company and are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit material facts about the Company to others, whether within or outside the Company, including the Company's independent auditors. In addition, any Representative of the Company who has a supervisory role in the Company's disclosure process has an obligation to discharge his or her responsibilities diligently. In accordance with the Reporting of Outcomes Policy, the Company will inform the Board of Directors of any sanctions or outcomes from reviews, inspections and/or audits that could adversely affect regulatory compliance or licensure of the Company; the Board of Directors and regulatory agencies will be informed promptly of any such outcomes that adversely affect the Company; and the Company's accreditation body, ACHC, will receive reports of certain adverse occurrences or changes in ownership/management as well as the responses to the outcome and action taken as a result of the outcome.

85.   Lastly, Tactile's Code outlines the procedure and protocols to report any violations

of the Code. It states the following, in pertinent part:

> All Representatives of the Company must understand and comply with this Code. Violation of this Code will not be tolerated and will result in discipline for employees and other appropriate consequences for non-employees.

> Any person who knows or reasonably believes that any Representative of the Company has engaged or is engaging in Company-related conduct that violates this Code should report such information to an appropriate contact person listed in Schedule A to this Code.

> The Company also may commence legal proceedings, if necessary, to recover the amount of any improper expenditures, any profits realized by the offending Representative of the Company, and any financial detriment sustained by the Company. In appropriate circumstances, violations of this Code will be reported to the applicable authorities

86.    During the Relevant Time Period, the conduct of Defendants Moen, Blake, Mattys, Folkes and Rishe as described herein violated Tactile's code and those officers failed to discharge their responsibilities in their roles as executive officers.  Nevertheless, even after reviewing the Securities Class Action, the Demand Board failed to discharge their duties.

**2.  Tactile's Audit Committee Charter**

87.    Under the Audit Committee Charter in effect during relevant times, Defendants Nigon, Roche, and Burke (the "Audit Committee Defendants") owed specific additional duties to Tactile.  The Audit Committee, pursuant to its Charter, is responsible for assisting the Board in overseeing the financial reporting processes on behalf of the Board and reporting the results of its activities to the Board and preparation and certification of the Company's financial statements, to guarantee the independent auditors' report, or to guarantee other disclosures by the Company, among other things:

> STATEMENT OF POLICY

> The Audit Committee shall provide assistance to the directors in fulfilling their responsibility to the stockholders relating to corporate accounting, <u>reporting practices of the Company, and the quality and integrity of financial reports of the</u>

<u>Company</u>, as well as overseeing the Company's investment and cash management policies. In so doing, it is the responsibility of the Audit Committee to maintain free and open communication with the directors, the independent auditors, the internal auditors, and the financial management of the Company. Consistent with this function, the Audit Committee should encourage continuous improvement of, and should foster adherence to, the Company's policies, procedures, and practices at all levels. [Emphasis supplied]

RESPONSIBILITIES

The Audit Committee is responsible for the appointment, compensation and oversight of the work of any registered public accounting firm employed by the Company for the purpose of preparing or issuing an audit report or other related work. Any such accounting firm will report directly to the Audit Committee. The Audit Committee's oversight role includes responsibility for resolving disagreements between management and the accounting firm regarding the Company's financial reporting. The Audit Committee may commit the financial resources it deems appropriate for compensation to any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company.

The Committee shall have the authority and responsibility to adopt, modify and oversee the Company's investment and cash management policies; including to adopt and amend such policies and oversee management's administration of these policies.

The Chairman of the Audit Committee will be designated and publicized as the person responsible for the receipt, retention and presentation to the full Audit Committee for action on complaints regarding accounting and internal accounting controls or auditing matters. Submissions by the Company's employees of concerns regarding questionable accounting or auditing matters (which may be submitted on a confidential or anonymous basis) will be instructed to be communicated to the Chairman of the Audit Committee.

The Audit Committee has the specific authority to engage independent counsel, accounting, investment and other advisors, as the Audit Committee deems appropriate, and may commit the financial resources the Audit Committee deems appropriate for such purposes or for ordinary administrative expenses of the Audit Committee that are necessary or appropriate in carrying out its duties. In carrying out its responsibilities, the Audit Committee believes its policies and procedures should remain flexible, in order to best react to changing conditions and to ensure to the directors and stockholders that the corporate accounting and reporting practices of the Company are in accordance with all requirements.

The Audit Committee may form and delegate authority to subcommittees consisting of one or more members when appropriate, including the authority to

grant pre-approvals of audit and permitted nonaudit services, so long as decisions of such subcommittee to grant pre-approvals are presented to the full Audit Committee at its next scheduled meeting. In carrying out these responsibilities, the Audit Committee will:

FINANCIAL STATEMENT AND DISCLOSURE MATTERS [EMPHASIS SUPPLIED AS INDICATED BELOW]

1. Review the quarterly financial statements with financial management and the independent auditors prior to the filing of the Form 10-Q (or prior to the press release of results, if possible) to confirm that the independent auditors do not take exception to the disclosure and content of the financial statements, and discuss any other matters required to be communicated to the Audit Committee by the auditors. The Chair of the Audit Committee may represent the entire Audit Committee for purposes of this review.

2. Review the financial statements contained in the annual report to stockholders with management and the independent auditors to confirm that the independent auditors are satisfied with the disclosure and content of the financial statements to be presented to the stockholders. Review with financial management and the independent auditors the results of their timely analysis of significant financial reporting issues and practices, including changes in, or adoptions of, accounting principles and disclosure practices, and discuss any other matters required to be communicated to the Audit Committee by the auditors. Also review with financial management and the independent auditors their judgments about the quality, as well as acceptability, of accounting principles and the clarity of the financial disclosure practices used or proposed to be used, and particularly, the degree of aggressiveness or conservatism of the organization's accounting principles and underlying estimates, and other significant decisions made in preparing the financial statements.

3. <u>Inquire of management, the internal auditor, and the independent auditors about significant risks or exposures and assess the adequacy of the steps management has taken to minimize such risks to the Company.</u> [Emphasis supplied]

4.  Report the results of the annual audit to the Board of Directors. If requested by the Board, invite the independent auditors to attend the full board of directors' meeting to assist in reporting the results of the annual audit or to answer other directors' questions (alternatively, the other directors, particularly the other independent directors, may be invited to attend the Audit Committee meeting during which the results of the annual audit are reviewed).

**OVERSIGHT OVER COMPLIANCE AND CONTROLS**

5. Review and concur with management's appointment, termination, or replacement of the director of internal audit.

6.   Review with the independent auditors, the Company's internal auditor, and financial and accounting personnel, the adequacy and effectiveness of the accounting and financial controls of the Company, and elicit any recommendations for the improvement of such internal controls or particular areas where new or more detailed controls or procedures are desirable. Particular emphasis should be given to the adequacy of internal controls to expose any payments, transactions, or procedures that might be deemed illegal or otherwise improper.

7.   Review reports received from regulators and other legal and regulatory matters that may have a material effect on the financial statements or related Company compliance policies. [Emphasis supplied]

8.   Review and approve all related-party transactions required to be disclosed under applicable rules of the Securities and Exchange Commission.

9.   Review the internal audit function of the Company including the independence and authority required to meet its reporting obligations, the proposed audit plans for the coming year, and the coordination of such plans with the independent auditors

10.  Receive prior to each meeting, a summary of findings from completed internal audits and a progress report on the proposed internal audit plan, with explanations for any deviations from the original plan.

11.  On an annual basis, obtain from the independent auditors a written communication delineating all their relationships and professional services as required by applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the audit committee concerning independence. In addition, review with the independent auditors the nature and scope of any disclosed relationships or professional services and take, or recommend that the Board of Directors take, appropriate action to ensure the continuing independence of the auditors.

**OVERSIGHT OVER INVESTMENT AND CASH MANAGEMENT POLICIES**

12.  Establish an investment and cash management policy for the Company's cash and investment assets.

13.  Review and approve modifications of the Company's investment and cash management policies.

14.  Oversee management's administration of these policies, including the appointment of investment consultants, advisors, custodians and managers of

the Company's cash and investment assets.

**OTHER MATTERS**

15. Obtain the full Board of Directors' approval of this Charter and review and reassess this Charter as conditions dictate, but not less than annually.

16. Adopt the report of the Audit Committee disclosed in the Company's filings with the Securities and Exchange Commission.

17. Submit the minutes of all meetings of the Audit Committee to, or discuss the matters discussed at each committee meeting with, the Board of Directors.

18. Investigate any matter brought to the Audit Committee's attention within the scope of its duties, with the power to retain outside counsel for this purpose if, in its judgment, that is appropriate. Perform any other activities consistent with this Charter, the Company's Bylaws or applicable laws or regulations that the Audit Committee or the Board of Directors determines are necessary or appropriate.

88.    During the Relevant Time Period, Defendants Nigon, Burke and Roche, failed to loyally execute their duties as Audit Committee members.

### 3. Compliance and Reimbursement Committee Charter

89.    In addition to their common law and statutory duties described herein, under the Compliance Committee Charter in effect during relevant times, Defendants Roche and Huggenberger (the "Compliance and Reimbursement Committee Defendants") owed specific additional duties to Tactile. The Compliance and Reimbursement Committee, pursuant to its Charter, is responsible for assisting the Board in overseeing the Company's compliance with non-financial legal and regulatory requirements and overseeing the Company's compliance programs among other things:

**PURPOSE**

The Compliance and Reimbursement Committee (the "Committee") is appointed by the Board of Directors (the "Board") of Tactile Systems Technology, Inc. (the "Company") to assist the Board in:

- overseeing the Company's compliance with non-financial legal and regulatory requirements;

- overseeing the Company's compliance programs;

- reviewing the Code of Business Conduct and Ethics applicable to the Company's directors, officers and employees;

- overseeing the Company's compliance with health care reimbursement requirements; and

- overseeing corporate responsibility matters of the Company.

**MEETINGS AND COMMUNICATIONS**

The Committee shall meet as often as it determines necessary. The Committee shall regularly report its actions and recommendations to the Board.

**RESPONSIBILITIES**

**GENERAL**

1. The Committee will have general oversight of the Company's compliance with legal and regulatory requirements related to compliance matters, other than matters regarding financial compliance (accounting, auditing, financial reporting, internal control over financial reporting, securities law matters and investor disclosures), which are subject to the oversight of the Audit Committee. The legal and regulatory requirements over which the Committee has compliance oversight include, without limitation, federal and state laws and regulations relating to healthcare operations, such as: those administered by the U.S. Food and Drug Administration ("FDA"); antikickback, anti-inducement and other fraud and abuse laws; false claims laws; the Health Insurance Portability and Accountability Act of 1996 and the Health Information Technology for Economic and Clinical Health Act; federal open payments (the Physical Payments Sunshine Act) requirements; and consumer protection and unfair competition laws. [Emphasis supplied]

2. The Committee will have general oversight of the Company's compliance with health care reimbursement matters.

3. The Committee will have general oversight of the Company's objectives, policies and efforts related to corporate responsibility matters, including sustainability, environmental, corporate citizenship, social, political and public policy issues and developments.

4. The Committee relies on the expertise and knowledge of management and consultants as it deems necessary in carrying out its oversight responsibilities. Management of the Company is responsible for

conforming the Company's conduct to legal and regulatory requirements and the Company's internal policies and procedures. Management also is responsible for developing and supervising the Company's internal programs and monitoring the Company's compliance with applicable laws, regulations, policies and procedures.

**SCOPE**

5.  In exercising its authority and carrying out its responsibilities, the Committee shall:
    a.  <u>oversee the structure, operation and efficacy of the Company's compliance</u> and ethics program and reimbursement function, including the adequacy of the organization, responsibilities, plans, results, budget, membership, staffing and operations of the Company's compliance function; [Emphasis supplied]

    b.  meet periodically with the Company's Chief Executive Officer, chief compliance officer, head of reimbursement and other members of management as appropriate to receive reports and discuss compliance program activities, including but not limited to: (i) compliance-related activities undertaken by the Company; (ii) the training and education programs for the Company's employees and independent contractors related to compliance and ethics; (iii) the results of regulatory compliance audits or investigations conducted, both internal and by government or regulatory authorities such as the FDA; and (iv) any complaints or allegations relating to the Company's regulatory compliance (but not accounting or auditing) matters;

    c.  <u>review significant compliance risk areas related</u> to non-financial matters and steps management has taken to monitor, control and report such compliance risk exposures; [Emphasis supplied]

    d.  develop, in conjunction with the Company's internal regulatory audit function, the regulatory compliance audit and monitoring plan for the Company, and <u>monitor the effectiveness of the Company's compliance program</u> and recommend modifications as necessary or appropriate; [Emphasis supplied]

    e.  review the Company's Code of Business Conduct and Ethics applicable to the Company's directors, officers and employees (other than the Addendum for Senior Financial Management, which shall be reviewed by the Audit Committee) on at least an annual basis and make recommendations to the Board with respect to any changes thereto;

    f.  discuss with counsel or other advisers matters that may have a material impact on the Company's non-financial compliance policies and procedures;

    g.  review and <u>discuss any correspondence with regulators or governmental agencies which raise issues regarding the Company's</u> compliance <u>with legal and regulatory requirements related to the Company's business activities</u>; and

    h.  periodically discuss with management the Company's objectives, policies and efforts related to corporate responsibility matters, including with respect to sustainability, environmental, corporate citizenship, social, political and public policy matters.

**OTHER MATTERS**

6. The Committee shall assess the adequacy of this charter on an annual basis, and recommend any proposed changes to the Board for its approval.

7. Periodically review and report to the Board on the performance of the Committee.

## V.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

90.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Tactile, were able to and did directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal action. As a result, and in addition to the damages the Company already incurred, Tactile has needlessly expended, and will continue to needlessly expend, significant sums of money.

91.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

92.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

93.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in deceptive marketing, engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  During the Relevant Period, Individual Defendants collectively and individually initiated a course of conduct that was designed to and did engage in deceptive marketing. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein.  The Individual Defendants described herein was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

94.     Each of the Individual Defendants aided and abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

95.     At all times relevant hereto, each of the Individual Defendants was the agent of

each of the other Individual Defendants and Tactile and was at all times acting within the course and scope of such agency.

## VI.    FACTUAL BACKGROUND

### A.  Tactile's Business

96.    Tactile is a medical technology company that develops and provides medical devices for the treatment of chronic diseases at home, mainly lymphedema.  The typical first line of lymphedema treatment is called complete decongestive therapy ("CDT").  It consists of a combination of manual lymph drainage, compression therapy, exercise, and skin care, and it is considered the gold standard of lymphedema treatment. In severe cases or when CDT has failed to considerably reduce symptoms, physicians may prescribe surgery or a PCD. A PCD is a machine that is attached to an inflated sleeve or vest-like garment that contains many chambers that inflate sequentially to encourage lymph fluid flow in the desired direction.

97.    There are two types of PCDs: basic and advanced. Physicians typically must prescribe basic PCDs before prescribing any advanced PCD.  The Healthcare Common Procedure Coding System (HCPCS) is a collection of standardized codes that represent medical procedures, supplies, products, and services.  The codes are used to facilitate the processing of health insurance claims by Medicare and other insurers.  Simple PCDs, often known as the "segmental home model without calibrated gradient pressure," are assigned HCPCS Code E0651. According to Defendants' 2019 Form 10-K, its "Entre" system was "simple" or a "basic pneumatic compression device." Flexitouch and other advanced PCDs are classified as the "segmental home model with calibrated gradient pressure" and are identified by the HCPCS code E0652. To obtain reimbursement to Flexitouch, Tactile must certify "medical necessity" for Flexitouch for each patient.

98.    The Flexitouch is a fully automated, programmable, advanced pneumatic

compression device designed for the treatment of lymphedema in the home setting. The device consists of an electronic control unit and multiple contoured garment configurations for the legs, arms, head, neck, trunk, or chest.

99.    Tactile has publicly stated including in Form 10-Ks issued during The Relevant Period, that it markets its keystone product, the Flexitouch System, using a "direct-to-patient-and-provider model." This model supposedly allowed Tactile to directly approach patients and clinicians, Tactile said this model disintermediated the traditional medical equipment channel and captured the manufacturer and distributor margins. However, in its public disclosures during the Relevant Period Tactile failed to discloses that its "direct-to-patient-and-provider" model relied upon a paid army of doctors and trainers who were paid illegal referral compensation in violation of the AKS.

100.    The Flexitouch was Tactile's core product and has generated between 88%-92% of Tactile's total revenue between 2017 and 2020:

| Year | Flexitouch Revenue | Entre and Actitouch Revenue | Total Revenue | Flexitouch System Percentage of Total Revenue |
|------|--------------------|-----------------------------|---------------|-----------------------------------------------|
| 2017 | $100.3 | $9 | $109.3 | 92% |
| 2018 | $131.9 | $11.8 | $143.8 | 92% |
| 2019 | $171.3 | $18.2 | $189.5 | 90% |
| 2020 | $163.9 | $23.2 | $187.1 | 88% |

101.    The Company was focused on selling the Flexitouch product. ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████        ████████████████████████



*See* TAC_WEAVER_001044.

### 4. Tactile's Marketing Practices (i.e., illegal referral payments) Violated the AKS and FCA

102.    Tactile's business is heavily reliant on third-party payers like private insurers, Medicare, Medicaid, and the VA. Tactile's compliance with applicable federal and state rules and regulations is crucial to the Company's success, given its reliance on third-party, public payers. Tactile must conform with federal and state anti-kickback and self-referral rules, as well as the federal False Claims Act and Civil Monetary Penalties Law and state fraud and abuse provisions.

103.    CMS requires that when a provider like Tactile submits a claim for reimbursement, the provider certifies that it is in compliance with the AKS.

104.    In its Order on Defendants' Motion to Dismiss in the Securities Class Action, the District of Minnesota held Plaintiff had adequately pleaded violations of the AKS and FCA via use referral payouts to the "key opinion leaders" ("KOL") and trainers in training programs. Order

at 23.

### a. Key Opinion Leader ("KOL") Referrers Were Compensated Illegally

105.    Tactile engaged in an illicit kickback system in which it compensated physicians in exchange for prescribing Tactile's Flexitouch.

106.    To do so, Tactile employed a company-wide strategy to designate certain physicians, revenue sources, by designating them Key Opinion Leaders to facilitate paying remuneration to doctors and therapists with high referral rates i.e., the "Key OpinionLeaders" or "KOL."

107.    Tactile also utilized its Key Opinion Leader "program" to provide perks and benefits to compensate VA employees, who are prohibited from accepting any gift of a value greater than $20, with free private dinners. 18 U.S.C. § 201(b); 5 C.F.R. §§ 2635.202(a), 2635.204(a). Tactile encouraged targeting sales to its VA channel by, for example, establishing the "VA Million Dollar Club" for its sales team in 2018 and distributing bonuses to sales management specifically meeting VA revenue targets.

108.    Tactile compensated Key Opinion Leaders by adding them to the speakers' bureau for various Tactile Medical hosted events.  In 2019 alone, Tactile publicly reported payments to physicians of $829,902.24, including $125,855.37 for food and beverage.  In contrast, it reported only  $8,750.00  for "accredited or certified continuing education program[s]."

109.    In 2018 and 2019, Tactile remunerated San Francisco VA physician Dr. Arman Kirakosian a total of $4,401.58. In 2019, Dr. Kirakosian prescribed at least three Tactile devices, and from 2017 to 2020, the San Francisco VA reported the highest cost in the United States for orders for Tactile's devices.

110.    As another example, Tactile paid Dr. Ron J. Karni for trips to Los Angeles, Las

Vegas and Scottsdale to give a series of presentations. The presentation in Las Vegas took place at Lawry's The Prime Rib steakhouse. It included a private dinner that was attended by 20 people, including four VA employees. The dinner bill totaled $2,782.89, or $139.14 per person. Notably, VA employees are prohibited from accepting any gift with a value greater than $20. The Company also paid for Dr. Karni's stay in a king suite at the Wynn Encore Tower on the Las Vegas strip. Two days later, the Company paid Dr. Karni to give a presentation at Tommy Bahama in Scottsdale, Arizona. Tactile paid Dr. Karni $17,209.29 for the one-week trip.

111.    Indeed, Tactile's business growth depended on the KOL program and the recommendations and support of its products by Key Opinion Leaders. Tactile carefully tracked the ROI resulting from these dinners, avoiding investment in attendees who might not send referrals. As demonstrated by the chart below, in 2019 Tactile received a significant number of referrals from its paid KOL doctors.

| KOL Doctor | Remuneration Received from Tactile in 2019 | Number of Tactile Devices Referred in 2019 |
|---|---|---|
| Matthew M. Melin | $102,129.06 | 109 |
| Ron J. Karni | $84,935.05 | 123 |
| Igor A. Altman | $45,376.75 | 45 |
| Vinay Satwah | $27,819.12 | 179 |
| Nicholas Morrissey | $21,912.14 | 197 |
| Mihir Bhayani | $16,799.25 | 25 |
| Michael A. Vasquez | $6,188.06 | 23 |
| Jay K. Radhakrishnan | $2,863.64 | 158 |
| Willy Yung Wei-Chi | $1,817.22 | 12 |
| TOTAL | $309,840.26 | 871 |

112.    Another doctor, Houston area physician, Ulysses Baltazar, M.D., director of the wound care department of Sugarland Hospital, admitted this to Jody Allen, the owner of Qui Tam plaintiff Veterans First Medical Supply LLC ('VFMS'). Specifically, Dr. Baltazar stated to Allen that he and his staff received free lunches from, and he was a "paid spokesman" and a paid "advisor" to Tactile. This statement was made by Dr. Baltazar to Allen when he explained to Allen

why all pneumatic compression devices were then being and would continue to be ordered from Tactile and not from VFMS or other competitors of the Company. The foregoing information is sourced from the Qui Tam Action.

113. This practice was illegal under the federal Anti-Kickback Statute. The AKS makes it illegal to offer or pay remuneration to any person with the intent of inducing that person to (1) refer for furnishing or arrange for furnishing any item or service for which payment may be made under a federal healthcare program; or (2) purchase, lease, order, or arrange for or recommend the purchase, leasing, or ordering of any item for which payment may be made under a federal healthcare program.

114. Defendants knew (turned a blind eye) such practices were illegal and "high risk" because 

115.

. *See* TAC_WEAVER_000905. Moreover, the Department of Health and Human Services Office of the Inspector General has also flagged these kinds of "speaking arrangements" as high risk for fraud and abuse in a "Special Fraud Alert." The U.S. Department of Justice and Office of Inspector General had investigated numerous cases in which compensation for "speaking events" was found to be illegal remuneration.

### b. Trainer Referrers Were Compensated Illegally

116.    In another illegal scheme, Tactile implemented a "trainer" program to obtain referrals for its Flexitouch from non-physician healthcare providers, such as therapists.

117.    That "trainer" scheme worked as follows: Staff in Tactile's Minneapolis offices assigned and coordinated the trainers for home visits. Tactile paid the trainers $150 per training. Coincidentally, these trainers were employed at the very hospitals and other facilities in which Tactile sought to sell its products. The trainers were incentivized to refer physicians to Flexitouch because encouraging Flexitouch prescriptions helped secure the trainers continuing assignment by Tactile to future in-home training sessions. In fact, the Company evaluated the trainers not on their ability to successfully train patients in the product, but rather in getting more referrals for Flexitouch.  One Tactile evaluator for a trainer's "performance assessment" wrote: "*Wish she'd get more patients*."

118.    Tactile allegedly dismissed trainers who failed to provide enough referrals. Tactile's compliance officer, attorney Sunday Hoy, "documented that Tactile's arrangements with therapists [for its trainer program] posed a high 'Business Risk' for 'kickbacks.'

119.    The illegally paid trainers were identified in Tactile's SEC filing as Tactile's "sales and marketing interests" in Tactile's 2018 10-K.

### 5. Tactile Had a Pattern and Practice of Seeking Reimbursement For Services for Which Tactile Had Not Established Medical Necessity

120.    Besides using illegal kickbacks to induce Flexitouch sales, Defendants also concealed the fact that claims made to CMS provided "incorrect" medical necessity information that duped CMS into covering Flexitouch. For instance, a former Senior Sales Specialist stated that Tactile's basic device, Entre, was "*designed for failure*," and intended only to "demo" the device for an hour before recording that the treatment had failed, qualifying the patient for

Flexitouch. *Id.*  Similarly, Tactile sales representatives routinely provided pre-filled forms to doctors and drafted medical necessity narratives with instructions to the doctor to copy to his or her letterhead and sign.

121.    Not surprisingly, as Tactile's Board was made aware, a high percentage of Tactile's claims for reimbursement were denied and the percentage increased through 2019-2020.

122.    During the Relevant Period, government agencies rejected up to 80% of Tactile's requests for Flexitouch reimbursement due to Tactile's failure to properly demonstrate "medical necessity".  These facts were analyzed by OSS Research in its December 10, 2020 Report.  *See* **Exhibit A**.

123.    That report cites to data from CMS elicited through FOIA requests.  As hereinafter detailed, the Defendants caused Tactile's SEC filings to characterize and spin the high percentage of rejections as due to the regulator's casting "a wide net."

124.    Internal Tactile records demonstrate Defendants' real-time knowledge of these facts

125.

126.

43

██████████████████████████████████████████████████

████████████████████████████████████████████████

127.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████ In the Securities Class Action, this

Court held that such allegations sufficiently alleged violations of the FCA. Order at 23.

128.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

129.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

"██████████████████████████████████

███████████████████:



### B. The Qui Tam Action

130.    On January 22, 2019, the Department of Justice filed a "Notice of Election to Decline Intervention" in which its expressly reserved its right to intervene in the action. Qui Tam Docket. ECF No. 5.

131.    On January 23, 2019, Veterans First Medical Supply LLC ("VFMS") filed a sealed amended complaint against Tactile alleging, in part, Tactile violated the False Claims Act, 31 U.S.C. 3729, by submitting false claims and representations to the United States under the Medicare and Medicaid Programs for products and services bought by health care institutions and hospitals, including a VA Medical Center in Houston, Texas.

132.    In the Qui Tam Action, the amended complaint alleged that, in violation of the federal AKS, Tactile made illegal payments to physicians through speaker programs to persuade

them to write prescriptions for Flexitouch.  Additionally, VFMS stated that Tactile paid illicit kickbacks to physicians who worked for the hospitals that prescribed the Flexitouch devices. Tactile hired these physicians at hospitals to endorse Flexitouch with the expectation that the compensation to them would result in increased Flexitouch prescriptions.  A similar scheme compensated "trainers" who referred patients to Tactile or physicians compensated by Tactile for referrals.

133.    On February 13, 2019, the Company was served with the sealed Qui Tam Action complaint.  Meanwhile, Tactile's stock price proceeded to rise to more than $70 a share, with the market in the dark about the truth about Tactile's referral practices. Mattys sold Tactile stock the next day and the day after the Company received the Qui Tam Action, the biggest sales Defendant Mattys made during the Relevant Period.  Specifically, on February 14 and 15, 2019, two days after the Company received the sealed amended complaint in the Qui Tam Action and two weeks before the Company disclosed the Qui Tam Action to investors, Defendant Mattys sold $3.5 million of Tactile stock.

134.    After the disclosure of the Qui Tam Action, the price of Tactile shares plummeted 7.5%, or $4.53, from its closing price on March 20, 2019, to close at $55.57 on March 22, 2019. Nonetheless, Defendants kept Tactile securities artificially inflated by continuing to deny The Qui Tam amended complaint's accusations and promoting the Company's sales growth and potential market.

135.    As far as investors were told by Tactile's in its SEC filings, the Qui Tam Action was immaterial, and Tactile's investment story remained one of unbridled expansion in a huge and underserved industry. As a result, even after Defendant Mattys behemoth sale prior to revealing the Qui Tam Action, the Insider Trading Defendants continued to sell their shares while Tactile's

securities traded at artificially inflated prices.

   **C.**  **The Allegations Herein Are Corroborated By Facts**

      **1.**  **Tactile Produced Documents Pursuant To 8 Del. C. §220 Books and Records Request Which** ███████████████████████████████
███████████████████████████████

136.  ███████████████████████████████

███████████████████████████████████████████

███

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████.

*See* TAC_WEAVER_000553.

137.  ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████.

138.  ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████



139. ██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██ ████ ██ ██ ████ ████ (*See* TAC_WEAVER_000141 and TAC_WEAVER_000464).

140. Defendants knew or had reason to know or had access to information about the alleged kickback schemes and FAC violations but failed to disclose them and/or misrepresented other statements. Indeed, Tactile's own compliance officer. Sunday Hoy, a lawyer, stated ████████████████████████████

141. In a federal discrimination suit hereinafter detailed, a Tactile regional manager discussed "placing dead orders for volume's sake" and "illegal company activity" with another Tactile officer. *See* **Exhibit B**.

142. ██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

143.    Given Compliance Officer Hoy's close working relationship with the board and committee members, and the critical importance that a FCA or AKS violation would have on the Company's revenue, it is reasonable to infer that Compliance Officer Hoy discussed her ████████████████████████████████████████████████████████████ ████████ or that, at a minimum, Defendants would have had access to information about these schemes because it is reasonable to assume that top management were aware of matters central to Tactile's businesses operations.    Moreover, the Defendants on the Audit Committee and the Compliance and Reimbursement Committee were made specifically responsible for compliance with laws applicable to Tactile.    But Tactile's entire board was responsible for the "Risk Oversight" as reported to shareholders in Proxies issued during the Relevant Period. Tactile's board abdicated oversight of these key areas.

144.    The risks associated with the kickback and false claims violations were severe. Civil penalties include fines up to three times the amount the government paid for each false claim plus an additional penalty of up to $22,363 for each false claim paid. Under the Exclusion Statute, false claims violations can also lead to permanent exclusion from federal healthcare programs. Being experienced businesspeople with extensive health care industry backgrounds, Tactile's directors would have known of the risk of criminal prosecution from submitting reimbursement claims to government agencies before reimbursement was sought for sales generated by prefilled prescription and illegal payouts to patient-referrers. *See* **Exhibit C**.

**2.    Evidence From The Qui Tam Action Further Collaborates The Allegations Of Defendants' Wrongdoing.**

145.    As revealed in the Qui Tam Action by expert Thomas Suehs, former Executive Commissioner of the Texas Health and Human Services Commission, the evidence overwhelmingly demonstrates Tactile's liability under FCA and the AKS through its tie-in

provision to the FCA, 42 U.S.C. § 1320a–7b(g).  Thomas Suehs opined:

> Based on my review of the data and my over 4 decades' experience in oversight and management of health care systems in the State of Texas, including as the Executive Commissioner for Health and Human Services for the State of Texas it is my opinion that Defendant Tactile Systems Technologies, Inc. ("Tactile") is engaged in systemic and pervasive misconduct over a period of many years, resulting in artificially increased need/demand for its E0651 and E0652 pneumatic compression devices and excessive claims being submitted to and paid by Government healthcare programs. Tactile's misconduct includes (1) multiple illegal kickback schemes; (2) false claims for payment – including submitting orders for Durable Medical Equipment with pre-filled medical necessity or without proper showing of medically necessity completed by the treating physician, and doing so on a systematic basis; and (3) paying remuneration directly or indirectly, overtly or covertly, to persons to induce such persons to purchase, order or arrange for or recommend purchasing or ordering Tactile's E0651 and E0652 pneumatic compression pumps.
>
> ***
>
> As a DMEPOS [durable medical equipment prosthetics, orthotics and supplier], Tactile is subject to and prohibited from engaging in conduct that violates the False Claims Act or the Anti-Kickback Statute. However, Tactile violates both.  As a result, Tactile causes real, tangible and substantial harm to Medicare, Medicaid, Tricare and other Government healthcare programs. But for Tactile's concealment of these illegal activities, Tactile would not have been permitted to participate in Medicaid or Medicare programs and it would not have been permitted to submit claims for reimbursement and receive payment from the Government.

146.    Mr. Suehs points out that Tactile signed multiple provider agreements with Texas, including during the time he served as Executive Commissioner of the Texas agency which administers Medicaid. By annually entering into provider agreements with the Government, Tactile expressly and repeatedly affirmed its "understand[ing] that payment of a claim by Medicaid is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal antikickback statute and the Stark law)...Mr. Suehs states that as Executive Commissioner, he would not have permitted Tactile to participate in Government healthcare programs if he had known then what he now knows regarding Tactile's illegal activities, specifically, the activities revealed in the data

considered portion of his report. Mr. Suehs explains that Tactile's violations of the Anti-Kickback Statute and False Claims Act have caused significant damage to Government healthcare programs. Suehs goes on demonstrate that Tactile's "evolving care delivery model" violates that 31 USC 3729 and the Anti-Kickback Statute as well as the Center for Medicaid and Medicare's well-publicized warnings of Tactile's responsibilities under 31 USC 3729 and 42 USC 1320a-7b(b).

147. Other aspects of Tactile's wrongdoing were eventually revealed in the subsequent proceeding in Qui Tam Action. VFMS filed a motion for partial summary judgment in the Qui Tam Action complaint on January 2, 2021. Thomas Suehs, the Executive Commissioner of the Texas Health and Human Services Commission from 2009 to 2012, signed a declaration with the motion. Mr. Suehs said in his declaration that:

> I would like this Court to be aware that, while serving as Texas HHSC Executive Commissioner, if I had known that Tactile's business agreements targeted health care professionals in positions of influence over prescriptions, that Tactile remunerated these clinicians, or that these clinicians promoted Tactile's products, my administration and I would not have approved or allowed Tactile to be approved as a Medicaid Provider. I also would like this Court to know that my administration and I would not have allowed Tactile to participate in the Texas Medicaid program if Tactile had admitted that it engaged in such conduct.

148. In addition, his expert report included the following:

- "[Tactile] is engaged in systemic and pervasive misconduct over a period of many years, resulting in artificially increased need/demand for its E0651 and E0652 pneumatic compression devices and excessive claims being submitted to and paid by Government healthcare programs.";

- "As a DMEPOS, Tactile is subject to and prohibited from engaging in conduct that violates the False Claims Act or the Anti-Kickback Statute. However, Tactile violates both;"

- "In sum, Tactile's illegal activities are the very sort of activities that I sought to detect and prevent while I served as executive commissioner of Health and Human Services;"

- "The volume, manner, nature, and extent of these payments to 'trainers' evidences a *clear intent by Tactile to induce such persons to indirectly arrange for furnishing and for recommending ordering Tactile pneumatic compression devices* for which payment is made in whole or in part under a Federal health care program. Tactile's methodology involves indirect inducements managed by personnel in Tactile's headquarters whereby training opportunities are auctioned to 1099 therapists on a 'first come first serve' basis, often involving substantial mileage reimbursements that on the surface are not commercially reasonable";

- "Based on third-party, complex analysis and review of Tactile's CMS claims for 2019, 75% of all Tactile claims to the government for reimbursement are not medically necessary"; and

- "Tactile's business model places significant reliance on the use of hundreds of clinical insiders who, posing as in-home trainers, promote the purchase or ordering of Tactile's products at the insiders' clinics . . . ."

149.    Mr. Suehs computed the penalties for Tactile's AKS violations to be $694,715,840

with actual damages of $32,731,853.65.

150.    The VFMS expert Cynthia Brock also opined:

Based on my review of the data and documents available for review, it is my opinion that Tactile System Technologies, Inc. ("Tactile") has been engaged in long term, systemic processes which violate the False Claims Act and Anti-kickback Statute regarding kickback schemes and false claims for payment. My opinion is based on more than 30 years of experience in support, management and oversight of Medicare and Medicaid conditions of participation and conditions of billing in a variety of regional and national healthcare corporations as well as working knowledge of the standard or practice in agreements/relationships with DMEPOS suppliers. CMS and State Medicaid Programs are transparent and comprehensive in their requirements for participation regarding inducement for referrals and integrity of claims, specifically the physician's certification of medical necessity. A review of documents provided clearly indicates noncompliance with these regulatory provisions as evidenced by compensation to a select group of practitioners, sample of pre-filled medical necessity verbiage for certifying physicians, as well as supporting results of ongoing CMS RAC (Recovery Audit Contractor) audit.

\* \* \*

A review of documents provided reflects Tactile's 1099 compensation to the treating clinicians of patients for the home education session and is a direct violation of the regulation. Further, Tactile's concealment and non-disclosure that

it remunerates these clinicians as trainers and remuneration of prescribing physicians to promote Tactile's products violates the statutes and creates an unfair market for other providers who are in fact complying with the federal regulation. It is also noteworthy that Tactile provides gift cards to clinic employees for redemption by internal email but no document of corresponding policy and procedure regarding internal guidelines for this practice was available for review.

## D. **OSS Research Reports**

### 1. **The June 8, 2020 Report**

151.    On June 8, 2020, *Seeking Alpha* published a report called: "Strong Sell on Tactile Systems: Bloated Stock Needs Compression Therapy," written by OSS Research.[6]   While a different version of the report was originally posted on May 30, 2020, on ossresearch.com, the website had never before published any report about any stock. Until June 2020, ossresearch.com had no web traffic, according to a web traffic analytics report.   Thus, when *Seeking Alpha* "welcomed" OSS Research as a new contributor on June 8, 2020, no other major news source, including *Bloomberg News*, had picked up the report, and the market was unaware of the information.

152.    The June 8, 2020 OSS Report also analyzes the RAC audits of Tactile's Medicare claims that were denied for lack of medical necessity.   According to the report, the RAC audits show that "Tactile has fundamentally failed to establish grounds for medical necessity on 71% of all its Medicare claims." (June 2020 OSS Rep. at 23.).

153.    Upon *Seeking Alpha*'s publication of the report, the market swiftly reacted to the new information disclosing: (i) additional details regarding the illegal sales practices in which Tactile engaged; (ii) that Tactile was at the center of a CMS audit process finding that submitted claims for Flexitouch had failed to establish medical necessity; and (iii) that Tactile's TAM was a

---

[6]   *See* OSS, Strong Sell on Tactile Systems: Bloated Stock Needs Compression Therapy, https://seekingalpha.com/article/4394053-strong-sell-on-tactile-systems-part-ii.

fraction of the size Tactile had disclosed.

154.    To begin, the investigation included representations from executives in the lymphedema business that offered further information on the scheme's mechanics and revealed that Tactile's kickback crimes were widespread and well-known inside the sector. While these representations substantiated the Qui Tam Action claims, they also revealed further details concerning the Company's improper sales tactics. For instance, executives in the lymphedema sector provided further examples of kickback and fraudulent claim infractions, including the following: Tactile representatives advising patients and therapists not to take CDT or basic devices seriously in order to obtain the advanced device later; (2) transmit pre-filled prescriptions to prescribers; and (3) falsifying timelines to fulfill coverage requirements.

155.    The *Seeking Alpha* post also revealed the conclusions, consequences, and ramifications of the RAC audit for the first time. According to the report, the RAC auditor initiated a CMS-approved audit of PCDs and the medical necessity criterion in January 2019. Tactile also had the highest number of audited claims disallowed for lack of medical necessity, with 71% of its claims flagged for failure to show medical necessity. According to the research, the high denial rate indicates that the Company participated in billing fraud. The study also revealed that Tactile's accounts receivable for Medicare-related accounts had climbed by 50% since the commencement of the RAC investigation and that the audit was becoming increasingly focused on Tactile, exposing it to a higher risk of claw backs. For example, more than 75% of the sought claims in the audit's second phase were aimed towards Tactile.

156.    On this news, the Company's stock price fell 12.8%, or $6.95, from the prior trading day's high of $54.21 per share to close at $47.26 per share.

### 2. The December 10, 2020 Report

157.    On December 10, 2020, *Seeking Alpha* published a follow-up OSS article reporting that Tactile appeared to be overstating its revenue from Medicare and the VA. According to the article, Tactile's self-reported Medicare revenue was $22 million in 2019, while Medicare records provided pursuant to a FOIA request showed that Medicare paid only $14 million to Tactile in 2019 – suggesting that Tactile overstated its Medicare revenue by 58% in 2019. The overstatement continued into 2020. Tactile's self-reported Medicare revenue for the first half of 2020 was roughly $11 million, while FOIA records show that Medicare paid $6 million to Tactile in the first half of 2020. Similarly, Tactile's self-reported VA revenue was $31 million in 2019, while VA records provided pursuant to a FOIA request demonstrate that the VA paid only $25 million to Tactile in 2019.

158.    This December 2020 report also revealed Tactile had a pattern and practice for sales representatives and therapists to routinely provide pre-filled medical necessity forms to prescribing physicians, essentially usurping the role of doctor and "telling/giving the doctor what to diagnose and prescribe the patient." *See* https://ossresearch848213970.wordpress.com/2020/12/10/strong-sell-on-tactile-systems-addendum/.  Such a practice would violate of the False Claims Act and would subject Tactile to expulsion from the federal health care programs for fraudulent compliance certifications, jeopardizing one-third of its business.

159.    This illegal sales strategy was discovered after a reputable industry insider who works closely with lymphedema patients, distributors, and manufacturers," and who was sent—by mistake—documents suggesting that Tactile employees were providing pre-filled prescriptions and pre-written medical necessity letters to physicians.  The report includes copies of redacted cover letters and prescriptions with instructions for physicians to sign them.

160.    The December 2020 OSS research was supported by documents received from the FDA through a FOIA request concerning Tactile and uncovered the following:

a.  OSS research's December 10, 2020 report, released through Seeking Alpha, provides further corroboration in the allegations herein and is supported by hard data sourced from FOIA request upon the Center for Medicare and Medicaid Services and the VA.

b.   The 2nd OSS report documents the fact that as 2019 progressed, Medicare's RAC audit of Tactile's Medicare claims were being retroactively denied at even higher percentages with each new batch of claims being audited. The RAC Audit Data reflects denial rates of 81%.

c.  It also reflects that Tactile was receiving these audit results and retroactive denials in July 2019; December 2019 and February - March 2020, within the Relevant Period. The total number of claims reviews authorized by CMS skyrocketed as results rolled in.

d.  Starting with an authorization of 400 reviews in February 2019, CMS authorized 5,000 additional reviews in August 2019. Ex A at 4.

e.  OSS also details its analysis of Tactile's apparent over statement of Medicare revenue and provides data support sourced from FOIA response from CMS. Ex A at 6.

f.  OSS also details the dramatic increase in the Medicare denial rate from March 2019 (79%) to May 2020 (98%) which coincided with Mattys' departure in June 2020. Ex A at 10.

g.  OSS' analysis of data produced by VA's Office of Rehabilitation and Prosthetics

similarly indicates and overstatement by Tactile of reported VA revenue reported in Tactile's 2019 10-K.

**E.  Evidence From A Senior Sales Executive's Lawsuit Vs. Tactile**

161.    Finally, Tactile's management's proclivity to presenting a false and misleading picture of its "success" is reflected in an email filed in an employee discrimination action in the United States District Court in North Carolina (*Sempowich v. Tactile Medical Systems, Inc.*, Case 5:18-cv-00488-D).   That email appears in the docket at Document 46-3 Exhibit A-033 filed October 21, 2019.

162.    In that email, Sempowich, the former Mid Atlantic Regional Manager until March 2018, (reporting directly to Tactile's SVP of Sales, Defendant Rishe) states: "I discouraged as the RM the placing of dead orders for volume's sake that would drain company resources and not be billable." *Id*. at Tactile 0370080.  That employees' email also alludes to illegal conduct at Tactile and implies that Tactile's VP of sales pressured her to ignore it:

> The SVP of Sales has berated me over the numbers... when I became aware of two separate incidents of President Club members doing illegal company activity that would damage us in the present... I spent weeks, months doing drills... and chastised for probably not looking the other way... *Id*. at Tactile 370082.

**VII. DEFENDANTS MADE, SIGNED AND/OR ALLOWED TACTILE
TO MAKE FALSE AND MISLEADING STATEMENTS
IN PRESS RELEASES, SEC FILINGS AND/OR OTHER PUBLIC STATEMENTS**

**A.  Officers' Statements To Analysts and In Press Releases And Tactile's 10-Qs
and 8-Ks**

163.    On May 7, 2018, Tactile issued a press release regarding the Company's first-quarter results, which revealed that "Q1 Revenues Increased 35% Year-over-Year, Flexitouch Revenues Up 40%." Defendant Mattys stated in the press release stating 2018 Q1 results was "'marked by 40% growth in sales of our Flexitouch system."   He stated the following:

Our Flexitouch sales growth during the quarter continued to benefit from the expansion of our sales team in recent years, our efforts to target high-volume accounts and our expansion of in-network coverage with commercial insurers. In addition, *we saw strong growth in sales to the Veterans Administration hospital system*. We also made progress preparing for the commercialization of our latest-generation Flexitouch system, the Flexitouch Plus, which we launched in early April."

164.    Defendant Mattys misleadingly attributed Flexitouch's sales growth solely to legitimate activities – such as "the expansion of our field sales organization in recent years, our efforts to focus our sales team on targeting high- diagnosing clinicians and our expanded in-network coverage with commercial insurers" – while omitting any disclosure of the Company's vast, illegal referrer network.

165.    Following the press release, Defendants Mattys and Blake conducted a conference call with investors and analysts to discuss the Company's first quarter 2018 earnings. Defendants Mattys and Blake specifically stated:

[Mattys]

Our total revenue growth was driven by sales of our Flexitouch system, which grew 40% year-over-year to $24.5 million in the first quarter. . ..

Specifically, our Flexitouch sales growth during the first quarter benefited from; the expansion of our field sales organization in recent years, our efforts to focus our sales team on targeting high-diagnosing clinicians and our expanded in-network coverage with commercial insurers.

These key drivers each contributed to the strong top line growth we have reported over the past 2 years, and remain the primary strategic focus areas for our organization *as we pursue the $4 billion-plus addressable market opportunity in the United States lymphedema market.*

\*\*\*

In addition to these important long-term drivers of growth, our Flexitouch sales growth in the first quarter also benefited from strong sales into the Veterans Administration hospital system.

\*\*\*

The success we're seeing in the VA hospital system is also a result of the enhanced sales strategy we implemented throughout the course of last year.

Specifically, we added a number of dedicated VA specialists who help our reps to more effectively market and sell within the VA hospital network.

[Blake:]

Our revenue performance was driven by Flexitouch System sales, which increased $7 million or 40% year-over-year to $24.5 million. The increase in Flexitouch System sales was due to the expansion of our sales force, *growth in the Veterans Administration channel*, increased physician and patient awareness of the treatment options for lymphedema and increased contractual coverage with national and regional insurance payers.

166.    Defendant Mattys falsely attributed Flexitouch's sales growth to legitimate activities such as "the expansion of our field sales" while disregarding the Company's illegal business and sales practices.    Defendants' overly upbeat representation about Tactile's considerable revenue growth in 1Q18, fueled by sales of our Flexitouch product, was materially false.  Individual Defendants failed to disclose that illicit sales activities, such as bribes to doctors and trainers for driving sales to VA patients, as well as false claims submitted to CMS, contributed to the stated revenue growth via over-prescription of FlexiTouch.

167.    In addition, on May 7, 2018, Defendants filed with the SEC Tactile's Quarterly Report on Form 10-Q for the quarter ended March 31, 2018 ("1Q18 Form 10-Q"), signed by Defendant Blake.

168.    The 1Q18 Form 10-Q, revealed there was a considerable increase in revenue, which Defendants credited to "an increase of approximately $7.0 million, or 40%, in sales of our Flexitouch system," which consisted of "growth in the Veterans Administration channel":

Revenues increased $7.0 million, or 35%, to $26.8 million in the three months ended March 31, 2018, compared to $19.9 million in the three months ended March 31, 2017. The growth in revenues was attributable to an increase of approximately $7.0 million, or 40%, in sales of our Flexitouch system in the three months ended March 31, 2018. *The increase in Flexitouch system sales was largely driven by expansion of our salesforce, growth in the Veterans Administration channel*, increased physician and patient awareness of the treatment options for

lymphedema, and expanded increased contractual coverage with national and regional insurance payers.

169.    The statements above were also materially false and misleading and omitted material facts because (i) the "'strong growth'" in the VA channel was based in part on Tactile's network of referrers who were being compensated illegally entailing kickbacks; (ii) claims submitted to CMS without legitimate substantiation of "medical necessity"; (iii) there was at least a threefold exaggeration of the "$4 billion-plus addressable market opportunity"; and (iv) Tactile was engaged in "high risk" sales and marketing practices, putting roughly 30% of its revenue through its VA and CMS channels in danger of being barred from participating in government healthcare programs.

170.    On August 6, 2018, Tactile released a press release reporting its 2Q18 results on a Form 8-K filed with the SEC and signed by Defendant Blake. The 2Q18 revealed:

> Total revenue for the second quarter of 2018 increased $7.9 million, or 30%, to $34.1 million, compared to $26.3 million for the quarter ended June 30, 2017. The increase in revenue was primarily attributable to an increase of $7.1 million, or 30%, in Flexitouch system sales. The increase in Flexitouch system sales was largely driven by expansion of our salesforce, *growth in the Veterans Administration channel*, increased physician and patient awareness of the treatment options for lymphedema, and expanded contractual coverage with national and regional insurance payers.

171.    Defendant Mattys was also quoted in the press release highlighting the Company's objective of targeting the VA system:

> Flexitouch system sales continue to drive our revenue growth – increasing 34% over the first six months of 2018 – fueled by the powerful combination of a focused selling strategy, *targeting high-volume accounts and the Veterans Administration hospital system*, strong sales team execution, and our expansion of in-network coverage with commercial insurers.

172.    Later that same day, Defendants Mattys and Blake hosted a conference call to discuss the Company's earnings for 2Q18. On the earnings call, Mattys made the following

statements:

> We reported impressive sales performance over the first 6 months of 2018, generating total revenue of $61 million, representing 32% growth year- over-year. Sales of our Flexitouch Systems were the primary driver to our growth in the period, increasing 34% year-over-year to $55.9 million.

> \*\*\*

> In addition to these primary growth drivers, our Flexitouch sales growth also benefited from *very strong sales into the Veterans Administration hospital system*. Sales into the VA over the first half of 2018 represented approximately 21% of our total revenue compared to approximately 18% in the first half of 2017.

> \*\*\*

> In conclusion, with our enhanced Flexitouch Plus system on the market, compelling new clinical and economic evidence in support of our therapy and a recently expanded IP portfolio, we are now better positioned to continue our leadership of the U.S. lymphedema market and grow our share of this *$4 billion-plus opportunity*.

173.    Additionally, on August 6, 2018, Tactile filed with the SEC Defendant Blake's Quarterly Report on Form 10-Q for the quarter ended June 30, 2018 ("2Q18 Form 10-Q"), which included a 30% year-over-year increase in total revenue from Flexitouch. Due to the Company's reported outsized revenue growth, the Company increased its year-end revenue projection once again.

174.    The 2Q18 Form 10-Q reiterated the following information regarding Tactile's revenues:

> The growth in revenues was attributable to an increase of approximately $7.1 million, or 30%, in sales of our Flexitouch system in the three months ended June 30, 2018, and an increase of approximately $14.2 million, or 34%, in sales of our Flexitouch system in the six months ended June 30, 2018. *The increase in Flexitouch system sales was largely driven by* expansion of our salesforce, *growth in the Veterans Administration channel*, increased physician and patient awareness of the treatment options for lymphedema, and expanded contractual coverage with national and regional insurance payers.

175.    In the 3Q18, Individual Defendants continued to emphasize Tactile's growth in Flexitouch revenues, which was fueled in part by VA channel sales, while concealing the fact that a material portion of sale were generated from Tactile's referrer network being compensated illegally.  On November 5, 2018, Tactile issued its press release reporting its 3Q18  financial results on a Form 8-K filed with the SEC and signed by Defendant Moen.  The 3Q18 press release revealed:

> Total revenue for the third quarter of 2018 increased $8.0 million, or 28%, to $36.3 million, compared to $28.3 million for the quarter ended September 30, 2017. The increase in revenue was primarily attributable to an increase of $7.1 million, or 27%, in Flexitouch system sales. The increase in Flexitouch system sales was largely driven by expansion of our salesforce, *growth in the Veterans Administration channel*, increased physician and patient awareness of the treatment options for lymphedema, and expanded contractual coverage with national and regional insurance payers.

176.    The press release quoted Defendant Mattys touting the Flexitouch system as an income generator:

> "Flexitouch system sales continue to drive our revenue growth – increasing 31% over the first nine months of 2018 – fueled by strong sales team execution and an overall positive response to the new Flexitouch Plus system, which we launched earlier this year. . .."
>
> . . . "We remain confident in our ability to continue driving strong growth as we maximize the powerful combination of an expanding sales force, *a focused selling strategy targeting high-volume accounts and the Veterans Administration healthcare system*, and our expansion of in-network coverage with commercial insurers."

177.    Later that same day, certain Defendants held an earnings call with investors to discuss the financial results for 3Q18. During the earnings call, Mattys emphasized the "primary growth drivers [for] Flexitouch sales," and underscored the selling strategy and the VA channel:

> We achieved an impressive sales performance over the first 9 months of 2018, generating revenue of $97.3 million representing 31% growth year-over- year. Sales of our Flexitouch Systems continue to be the primary driver of our growth, increasing 31% year-over-year to $89.2 million.

***

In addition to these primary growth drivers, our Flexitouch sales growth continued to benefit from very strong sales into the Veterans Administration health care system. Sales into the VA over the first 9 months of 2018 increased 44% year-over-year, representing approximately 20% of our total revenue compared to approximately 19% in the first 9 months of 2017.

***

Our Flexitouch Plus System remains our primary driver of growth, and we're confident in our ability to continue driving strong growth as we maximize the powerful combination of an expanding sales force, *a focused selling strategy targeting high-volume accounts and the Veterans Administration channel* and our expansion of in-network coverage with commercial insurers.

178.    On November 5, 2018, Defendant Mattys made materially false and misleading assertions regarding Flexitouch's revenue opportunity and market demand, stating that "[w]e believe we are incredibly well-positioned to continue our leadership of the U.S. lymphedema market and grow our share of the *$4-plus billion market opportunity* that it represents."

179.    In addition, on November 5, 2018, the Company filed with the SEC Tactile's Quarterly Report on Form 10-Q for the period ended September 30, 2018 ("3Q18 Form 10- Q"), signed by Defendant Moen.

180.    The 3Q18 Form 10-Q confirmed the following information about Tactile's revenues:

Revenues increased $8.0 million, or 28%, to $36.3 million in the three months ended September 30, 2018, compared to $28.3 million in the three months ended September 30, 2017. Revenues increased $22.9 million, or 31%, to $97.3 million in the nine months ended September 30, 2018, compared to $74.4 million in the nine months ended September 30, 2017. The growth in revenues was attributable to an increase of approximately $7.1 million, or 27%, in sales of our Flexitouch system in the three months ended September 30, 2018, and an increase of approximately $21.3 million, or 31%, in sales of our Flexitouch system in the nine months ended September 30, 2018. The increase in Flexitouch system sales was largely driven by expansion of our salesforce, *growth in the Veterans Administration channel*, increased physician and patient awareness of the treatment options for lymphedema, and expanded contractual coverage with national and regional insurance payers.

Revenues from the Veterans Administration represented 19% and 20% of total revenues in the three months ended September 30, 2018, and 2017, respectively. Revenues from the Veterans Administration represented 20% and 19% of total revenues in the nine months ended September 30, 2018, and 2017, respectively. Revenues from Medicare represented 10% and 6% of total revenues in the three months ended September 30, 2018, and 2017, respectively. Revenues from Medicare represented 8% and 9% of total revenues in the nine months ended September 30, 2018, and 2017, respectively.

181. Defendants continued to stress to the market the rate of the Company's revenue growth for the remainder of 2018 and the size of the market while concealing the facts of its illicit sales activities and of its referrer network scheme. On January 7, 2019, Tactile issued a press release on a Form 8-K filed with the SEC, signed by Defendant Moen. Tactile's preliminary full year and fourth quarter 2018 results were reported in the press release, which included the following remark from Defendant Mattys:

"We are excited to close the year with another quarter of strong execution, *with revenue growth in excess of 30%, driven by sales of our Flexitouch systems* . . .. Our Flexitouch sales this quarter were driven by several of our primary growth drivers, including the expansion of and continuing execution from our field sales team, and higher than expected volume from a direct contract with a large commercial payer initiated in the third quarter. 2018 was an exceptional year for Tactile Medical, with record sales growth driven by the successful launch of our Flexitouch Plus system in the second quarter, our targeted selling strategy focused on our most productive accounts *and strong sales growth in the Veterans Administration channel*."

. . . "Looking ahead to 2019, we remain confident in our ability to deliver 20% plus revenue growth and improving profitability as we continue to *expand our share of the $4+ billion U.S. market in lymphedema and chronic venous insufficiency*."

182. Tactile's stock price surged 26 percent from its close on January 7, 2019, at $47.35 per share to $59.73 on January 8, 2019, and continued to soar in the weeks after, owing to a reiteration of revenue growth exceeding 30% and an expanding market for Flexitouch.

183. In February and March 2019, Mattys sold over 80,000 shares of Tactile stock at prices in the $70s per share.

184.    On February 28, 2019, Tactile issued a press release on a Form 8-K filed with the

SEC, signed by Defendant Moen.   The press release reported on Tactile's 4Q18 and full-year

2018 financial results.   The press release revealed:

> Revenue for the fourth quarter of 2018 increased $11.6 million, or 33%, to $46.4
> million, compared to $34.9 million for the quarter ended December 31, 2017. The
> increase in revenue was primarily attributable to an increase of $10.3 million, or
> 32%, in sales of the Flexitouch system. The increase in Flexitouch system sales was
> driven by continued expansion of our salesforce, the successful roll-out of our new
> Flexitouch Plus system, growth in the Veterans Administration channel, increased
> physician and patient awareness of the treatment options for lymphedema, and
> expanded contractual coverage with national and regional insurance payers.

185.    The following remarks from Defendant Mattys were quoted in the press release:

> The top-line growth was driven by the successful launch of our Flexitouch Plus
> system, continuation of our targeted sales strategy focused on high-volume
> accounts and *strong growth in the Veterans Administration channel*. We also made
> further progress toward expanding our portfolio of clinical evidence and increasing
> awareness among clinicians, payers and patients of the benefits of our clinically
> proven, cost-effective, at-home treatments for chronic conditions.
>
> . . . Looking ahead to 2019, we remain confident in our ability to deliver 20%+
> revenue growth and improved profitability, as we continue to *expand our share of
> the $4+ billion U.S. market in lymphedema and chronic venous insufficiency*.

186.    Despite these damning allegations, Tactile continued to boast the Company's

business growth and success.   On February 28, 2019, Tactile hosted an earnings conference call

for investors to discuss its fourth quarter and fiscal year 2018 results. Ignoring the allegations in

the Qui Tam Action. Defendant Mattys highlighted during the call the "exceptionally strong

sales," and remarked on Tactile's revenue increase, as well as its contribution to the growth of

the VA sales channel:

> Simply stated, 2018 was a phenomenal year for Tactile Medical. *We achieved
> revenue of $143.8 million for the full year, representing 32% growth year-over-
> year, exceeding our 2018 guidance range*. Our 2018 revenue growth was driven by
> sales of our Flexitouch systems, which increased 31% year-over-year to $131.9
> million.

\*\*\*

In addition to these primary drivers, we also achieved exceptionally strong sales in the VA healthcare system throughout 2018. *Sales into the VA in 2018 increased 42% year-over-year and represented approximately 20% of our total revenue* compared to approximately 18% in 2017.

*Our success in the VA throughout 2018 was primarily due to the continued effectiveness of our team of dedicated VA specialists*, whose expertise helps our sales team navigate the VA system and optimize their selling efforts there.

\*\*\*

Our growth in the fourth quarter benefited from exceptionally strong sales of our latest generation Flexitouch System in the commercial and VA channels

187.    Defendant Moen similarly reported on Tactile's revenue performance for 4Q18:

The increase in Flexitouch System sales was largely driven by expansion of our sales force, the successful rollout of our new Flexitouch Plus system, *growth in the Veterans Administration channel*, increased physician and patient awareness of the treatment options for lymphedema and expanded contractual coverage with national and regional insurance payers.

188.    Mattys made false statements in response to analysts' questions. Anna Nussbaum, an analyst from William Blair, inquired about the Company's 2019 revenue guidance with respect to the VA contribution:

Anna Nussbaum -- *William Blair -- Analyst*
Sorry about that. This is Anna in for Margaret. Thanks for taking my question. I wanted to touch base again on guidance relative to the volume benefit seen in the fourth quarter. *Are you essentially assuming these benefits are continuing into 2019? And then what are you assuming in guidance in terms of those VA contribution given the new supply schedule for Plus and then any changes in commercial contract*s? Thanks.

Gerald R. Mattys -- *Chief Executive Officer and Director*
So, we've got VA, commercial and volume from the new contract. Let me start with VA. *Our growth in last year was about 42%, which pushed the total sales to 20% of revenue. The VA specialists that we've put in place have been extraordinarily helpful for our local sales team in supporting them and navigating the VA channel.* We think there is a tremendous opportunity to continue going deeper into the accounts we've already opened and as we included in our 10-K this afternoon, *we've gone from 140 to 150 of the VA hospitals being active in terms of ordering product*

66

*from us.*

189.    Individual Defendants further proceeded to misrepresent the potential market size by directing investors to Tactile-led claims data analysis that claimed demonstrated a substantial increase in the number of new lymphedema diagnoses each year. For instance, during the Company's fourth-quarter and full-year 2018 earnings conference call, Defendant Mattys stated: system:

> With respect to our account targeting strategy, we performed another data analysis of medical claims in December of 2018. *The data showed there were 1.1 million patients diagnosed with lymphedema in the 12-month period ending June 30, 2018,* compared to 700,000 patients in the 12-month period ending December 31 of 2013, the first time we performed this analysis. This represents a compounded annual growth rate of 11% over the last 4.5 years. While we're proud of the strong growth we've reported in recent years and the mounting evidence that the awareness of lymphedema is growing, remember, we remain in the early stages of penetrating the large and addressable market opportunity in the United States. Specifically, the most recent claims data showed more than 4,700 high diagnosing facilities in the United States and nearly 50% of these facilities had at least one clinician doing business with Tactile Medical. This compares to a little more than 40% of the high diagnosing facilities as of the last claims data pool in 2017.

> We believe this new claims data not only reinforces the progress we have made in penetrating the market over the last two years, b*ut also shows the significant opportunity that remains as we focus our sales force on the many high diagnosing facilities that are not currently doing business with Tactile Medical.* We are intently focused on introducing our differentiated at-home lymphedema treatment option to all of these high diagnosing facilities in the coming years.

> ***

> We sold 35,000 units last year – *32,000, sorry, units last year and that's on 1.1 million patients diagnosed.* So, this is a vastly underpenetrated market that we're in now, and we want to try to focus our efforts there.

> ***

> In conclusion, for all these reasons, Tactile Medical will continue to lead the U.S. lymphedema market and grow our share of the *$4 billion plus opportunity* that it represents in 2019 and in the years to come.

190.    On May 6, 2019, Tactile issued a press release announcing its 1Q19 financial results on a Form 8-K submitted with the SEC and signed by Defendant Moen. According to the press release, Company had a considerable revenue increase this quarter:

> Revenue for the first quarter of 2019 increased $10.8 million, or 40%, to $37.6 million, compared to $26.8 million for the quarter ended March 31, 2018. The increase in revenue was attributable to an increase of $9.6 million, or 39%, in sales and rentals of the Flexitouch system and an increase of approximately $1.2 million, or 51%, in sales and rentals of our Entre/Actitouch systems in the three months ended March 31, 2019. The increase in Flexitouch system sales and rentals was largely driven by expansion of our salesforce, *growth in the Medicare channel*, increased physician and patient awareness of the treatment options for lymphedema, and expanded contractual coverage with national and regional insurance payers

191.    Defendant Mattys was quoted in the 1Q19 press release complimenting the "exciting start to 2019" and entry into the lymphedema market:

> Our first quarter performance reflects an exciting start to 2019, driven by strong adoption of our Flexitouch Plus system . . .. First quarter revenue results benefitted from the investments we have made in our sales team, the continuation of our targeted sales strategy focused on high-volume accounts and stronger than expected sales volumes due to a new contract with a large commercial payer.
>
> ***
>
> We remain confident in our ability to deliver strong revenue growth and improved profitability, as we continue to expand our penetration of *the $4+ billion U.S. lymphedema and chronic venous insufficiency markets*.

192.    Later that same day, Tactile held an earnings conference call for investors regarding the 1Q19 earnings. Defendants maintained their upbeat message during the 1Q19 earnings conference call held the same day, in which Defendant Mattys touted Tactile's 40 percent year-over-year revenue growth, "led by sales and rentals of our Flexitouch Systems, which climbed 39% year over year to $34.1 million."

193.    Defendant Mattys remarked on the VA channel: "We also continue to see strong performance in the VA during the first quarter, in part due to the efforts of our dedicated VA

specialists, who have helped our sales rep's market more effectively within the VA Hospital System."

194.    In addition, an analyst at William Blair & Company LLC ("William Blair") inquired about the VA channel's sales performance:

Margaret Kaczor -- William Blair -- Analyst

The first one for me is maybe a little bit of a focus on the VA, which I think was roughly about 20% of total sales this quarter. Still showing some nice growth, but down maybe from 23% in the year-ago period. Can you give us a little bit of color, how much of that is because of the change in rev[enue] rec[ognition] as that maybe changed the mix? And then maybe some more detail around the sales within that channel. So, the Flexitouch Plus having the first kind of full quarter impact within their maybe gaining momentum and then some of the strategy around the tertiary VA centers that you guys referenced on the last call?

Gerald R. Mattys -- Chief Executive Officer

Yeah. Hi, Margaret. Thanks for the question. Our Medicare business was up again this quarter, which we expected and we're excited to see it did represent 20% of sales instead of the 23% last year. *You may remember last year, our first quarter revenue was up 73%, so we have a bit of a tough comp here in the VA channel specifically last year being so successful. We did see higher than our growth rate for the channel in shipments and did see some ASP drop by signing the new federal supply schedule contract that we did in the third quarter of last year.* So, volumes still ticking along pretty nicely. We did see a little price adjustment, which we anticipated as part of our plan for this year and it's I think reflected in our guidance for the 2019 total.

195.    Defendant Matty further emphasized Tactile's capacity to enter "the more than $4 billion U.S. lymphedema market":

Based on our latest analysis of claims data, we also estimated 11% annualized compounded growth in the number of patients diagnosed with lymphedema over the last 5 years. And more broadly, we continue to see mounting qualitative evidence of the increasing awareness of lymphedema and its treatment. In 2019, we look forward to demonstrating our commitment to leadership in the *more than $4 billion U.S. lymphedema market* as we continue to expand our share and deliver high-quality products and service to our patient and clinician customers.

196.    Guggenheim analyst inquired about an update regarding the Company's Qui

Tam Action. Defendant Mattys had the following exchange:

Chris Pasquale -- Guggenheim -- Analyst
Okay. And then, Jerry, can you provide any update on the legal action that was
initiated back in the first quarter, the qui tam suits from one of your competitors,
anything you can say there about where that stands?

Gerald R. Mattys -- Chief Executive Officer
Sure, Chris. I'll just reiterate what we've said previously and then let you know
where we are today. As we discussed in the 10-K, we were served with a sealed
complaint in the US District Court, Southern District of Texas on February 13th.
The suit was brought by a competitor and the US declined to intervene or join the
suit. That suit was unsealed March 20th of this year. We continue to believe the
allegations are without merit and we will vigorously defend ourselves. In fact, we
filed a motion to dismiss the suit on April 5th of this year. But as per additional
details, our policy is not to discuss details of outstanding litigation until we get a
little further in the process.

Chris Pasquale -- Guggenheim -- Analyst
Understood. There was one particular aspect of that complaint, which related to
your network of in-home trainers. Maybe it's worth just spending a minute on that
particular operating structure. Your confidence in its legality and why it's important
to the business? Thank you.

Gerald R. Mattys -- Chief Executive Officer
Yeah. Chris, we're not going to discuss any of the single items that were brought
up in the litigation. *We don't believe those allegations have any merit and we're
certainly looking forward to the opportunity to present that case.*

197.    Despite denying the qui tam allegations and implying the Qui Tam Action

complaint was frivolous, CEO Gerald Mattys had unloaded about $13,185,309.00 worth of stock

in the 12 months leading up to the May 6 earnings call and another $4,349,579 of stock over the

following 12 months.

198.    On August 5, 2019, Tactile issued its press release reporting its 1Q19 financial

results on a Form 8-K filed with the SEC and signed by Moen. The 1Q19 press release revealed:

Revenue for the second quarter of 2019 increased $11.1 million, or 32%, to $45.2
million, compared to $34.1 million for the quarter ended June 30, 2018. The
increase in revenue was attributable to an increase of $9.6 million, or 31%, in sales

and rentals of the Flexitouch system and an increase of $1.5 million, or 53%, in sales and rentals of our Entre systems in the quarter ended June 30, 2019. The increase in Flexitouch system sales and rentals was largely driven by expansion of our salesforce, increased physician and patient awareness of the treatment options for lymphedema, expanded contractual coverage with national and regional insurance payers and *growth in the Medicare channel*.

199.    Later that same day, the Tactile hosted an earnings conference call for investors.

Defendant Mattys stated the following in his opening remarks:

We achieved exceptional company performance during the first 6 months of 2019 with total revenue of $82.8 million, representing 36% growth year-over-year. Flexitouch Plus System sales and rentals were the primary driver of our revenue growth in the period, increasing 34% year-over-year to $75.1 million.

\*\*\*

We also experienced strong sales to patients with Medicare and VA coverage during the first half of the year.

Our performance serving the Medicare population has been particularly strong this year, representing 11% of our total revenues in the first 6 months compared to 8% in the same period last year. We believe that our decision in 2018 to transition Entré and ACTitouch order processing from our field team to our internal team of specialists has been an important contributor to this strong performance.

In the Veterans Administration channel, our sales performance continued to benefit from the new Federal Supply Schedule contract that we were awarded for our Flexitouch Plus System last September, along with the continued efforts of our dedicated VA specialists.

200.    Moen likewise reported on the Company's revenue:

Total revenue for the second quarter increased 32% to $45.2 million compared to $34.1 million for the quarter ended June 30, 2018. Our total revenue performance in the quarter was driven by sales and rentals of our Flexitouch systems, which increased $9.6 million or 31% year-over-year to $41 million. The increase in our Flexitouch revenue was largely driven by the expansion of our sales force, increasing physician and patient awareness of the treatment options for lymphedema, expanded contractual coverage with insurance payers, and *growth in the Medicare channel*.

201.    Furthermore, Individual Defendants began to shift their attention away from the

VA as a source of revenue growth and toward their Medicare channel.  According to the press

release, the Company's Flexitouch sales were boosted in part by "increase in the Medicare channel."

202.　　Defendant Mattys remarked that he envisioned "a bright future" for the Company because of particular "macro dynamic," involving "the more than $4 billion addressable U.S. market potential that lies in front of us":

> We continue to see a bright future in store for our company as we look at a number of important macro dynamics, including: the growing awareness of lymphedema in the market at both the clinician and patient level; *the more than $4 billion addressable U.S. market opportunity* that remains in front of us; and our unique position in the market, with an established direct-to-patient- and-provider model, proven reimbursement and payer relations expertise and innovative products, supported by extensive clinical and economic evidence.

203.　　According to a Piper Jaffray Companies Analyst who spoke to Defendant Mattys, he was "surprised" by the disparity between growth factors. The analyst stated: "It used to be very VA-heavier just given the growth rate there. But this year, it seems to be Medicare, less VA and more commercial. So maybe comment on that."  Defendant Mattys responded in part:

> In the first half of the year, Medicare made up 11% of sales versus 8% last year. We think the single biggest reason for that shift has been the move inside to lift the burden of paperwork and order processing from our field team so that they may focus on Flexitouch sales.
>
>                           ***
>
> We've made our biggest addition in VA reps last year, in 2018. So, for the first half of the year, the VA made up 19% of total revenue versus 20% over the same period last year. *We're very happy with the VA performance. Overall, it was up 22% year-over-year in that particular segment*.

204.　　On November 4, 2019, Tactile filed with the SEC a Form 8-K signed by Defendant Moen, included a press release announcing the Company's 3Q19 financial results for the period ended September 30, 2019. Individual Defendants' misrepresentations continued in 3Q19, with the Company citing the Medicare channel as a key driving Flexitouch sales growth. In addition, the 3Q19 press release revealed:

Revenue for the third quarter of 2019 increased $13.3 million, or 37%, to $49.6 million, compared to $36.3 million for the quarter ended September 30, 2018. The increase in revenue was attributable to an increase of $11.4 million, or 34%, in sales and rentals of the Flexitouch system and an increase of $1.9 million, or 64%, in sales and rentals of the Entre system in the quarter ended September 30, 2019. This revenue increase was largely driven by expansion of our salesforce, increased physician and patient awareness of the treatment options for lymphedema, broad in-network coverage with national and regional insurance payers and *growth in the Medicare channel*.

205.    Later that same day, Tactile hosted an earnings conference call for investors regarding the 3Q19 results. Defendant Mattys unscored the Company's Flexitouch market:

As we exit the year, we will continue to reinforce our leadership in the more than *$4 billion U.S. market opportunity for lymphedema and chronic venous insufficiency* by expanding and enhancing the productivity of our field sales organization and continuing to capitalize on the strong market response to our Flexitouch Plus system, our high diagnosing account targeting strategy and our broad in-network coverage with commercial payers.

206.    Furthermore, Defendant Moen provided the following revenue figures for the Company:

The increase in Flexitouch revenue was largely driven by the expansion of our sales force, increasing physician and patient awareness of the treatment options for lymphedema, broad in-network coverage with insurance payers and *growth in the Medicare channel*.

207.    Also on November 4, 2019, Tactile filed with the SEC Tactile's Form 10-Q for the period ended September 30, 2019 ("3Q19 Form 10-Q"), signed by Defendant Moen. The Company reported the following regarding its revenues for 3Q19:

Revenue increased $13.3 million, or 37%, to $49.6 million in the three months ended September 30, 2019, compared to $36.3 million in the three months ended September 30, 2018. Revenue increased $35.1 million, or 36%, to $132.4 million in the nine months ended September 30, 2019, compared to $97.3 million in the nine months ended September 30, 2018. The growth in revenue was primarily attributable to an increase of approximately $11.4 million, or 34%, in sales and rentals of our Flexitouch system in the three months ended September 30, 2019, and an increase of approximately $30.6 million, or 34%, in the nine months ended September 30, 2019. The increase in Flexitouch system sales and rentals was largely driven by expansion of our salesforce, increased physician and patient

awareness of the treatment options for lymphedema, the broad in-network coverage with national and regional insurance payers *and growth in the Medicare channel*.

208.    The 3Q19 Form 10-Q statements were false because:

a)    the "growth" in the Medicare channel that was highlighted as one factor "driv[ing]" the "increase in Flexitouch system sales" was based in part on illegal and unsustainable sales practices involving kickbacks paid to doctors and contract trainers;

b)    the Company's reported revenues were in part the product of illegal sales practices, including engaging in kickback schemes to push Flexitouch sales in the VA and CMS channels and submitting false claims to CMS;

c)    the Company's reported revenues from CMS and the VA were overstated, particularly in light of the RAC audit process imposing greater scrutiny on submitted claims;

d)    the "$4 billion U.S. market opportunity" for Flexitouch was overstated by at least three times;

e)    in violation of Item 303, Defendants failed to disclose that the Company was exposed to an extreme risk of legal and regulatory scrutiny that put nearly 30% of its business related to its VA and CMS channels at risk of exclusion from participating in the federal healthcare programs; and

f)    Defendants had failed to design internal controls to address the illegal practices alleged herein and materially misleading statements.

209.    On January 13, 2020, Tactile filed with the SEC a Form 8-K signed by Moen that attached a press release announcing the Company's preliminary full-year and 4Q19 revenue results and announced Defendant Mattys's intent to retire in 2020.  Defendant Mattys, who was quoted in the press release, discussed the Company's 2019 success in addition to the lymphedema market.

74

Our solid execution during the fourth quarter enabled us to bring 2019 to a strong close, with improved profitability and expected full year 2019 revenue growth of approximately 31% driven by investments in the field sales team, solid market adoption of the Flexitouch Plus system, a targeting strategy focused on the most productive accounts in the lymphedema market and the broad in-network coverage we have obtained with commercial payers. As we enter 2020, *we remain focused on expanding our share of the $4+ billion U.S. market in lymphedema and chronic venous insufficiency* and believe we are poised to deliver another year of 20% plus revenue growth and improved profitability.

210.    On February 26, 2020, Tactile filed with the SEC a Form 8-K, signed by

Defendant Moen that attached a press release reporting the Company's 4Q19 and full-year 2019

financial results. Specifically, the press release revealed:

Revenue in the fourth quarter of 2019 increased $10.6 million, or 23%, to $57.1 million, compared to $46.4 million in the fourth quarter of 2018. The increase in revenue was attributable to an increase of $8.8 million, or 21%, in sales and rentals of the Flexitouch system and an increase of $1.8 million, or 48%, in sales and rentals of the Entre system in the quarter ended December 31, 2019. This revenue increase was largely driven by expansion of our sales force, increased physician and patient awareness of the treatment options for lymphedema, broad in-network coverage with national and regional insurance payers and *growth in the number of Medicare patients served*.

211.    The company also presented the findings of a new medical research, which

revealed a "four-fold" rise in the prevalence of lymphedema:

On February 13, 2020, the Company announced the publication of a new clinical study demonstrating the prevalence of chronic venous insufficiency-related lymphedema ("CVI related lymphedema," also known as "Phlebolymphedema"). Researchers concluded that chronic venous insufficiency, not cancer-related therapy, may be the most common cause of lower extremity lymphedema in the United States. The new study suggests that the prevalence of lymphedema due to CVI is approximately 16 million individuals in the United States. *This, in addition to the estimated five million individuals living in the U.S. with cancer-related and primary lymphedema, increases the total prevalence estimates four-fold to over 20 million individuals*.

212.    According to the press release, Defendant Mattys informed investors of the

Company's "impressive performance" and the expanding lymphedema market:

We are pleased to report another quarter of impressive performance, which resulted in revenue growth of 23% year-over-year," said Gerald R. Mattys, Chief Executive Officer of Tactile Medical. "Our solid execution during the fourth quarter enabled us to bring 2019 to a strong close, with improved profitability and full year revenue growth of 32%. Our success was driven by investments in expanding our field sales team, solid market adoption of the Flexitouch Plus system, a targeting strategy focused on the most productive accounts in the lymphedema market and the broad in-network coverage we have obtained with commercial payers. *As we enter 2020, we remain focused on increasing our share of the growing $5+ billion addressable U.S. market opportunity in lymphedema and chronic venous insufficiency* and believe we are poised to deliver 20% or more top line growth and another year of improved profitability.

213.    Later that same day, Tactile hosted an earnings conference call for investors regarding the 4Q19 results. Defendant Mattys reiterated the study results that reported an increase in the prevalence of lymphedema:

This study, titled the clinical characteristics of lower extremity lymphedema in 440 patients, was a 3-year single-center retrospective study that documented the prevalence and manifestations of the 4 most commonly encountered causes of lower extremity lymphedema patients, who presented to an oncology- affiliated physical therapy lymphedema center. Researchers found that CVI was the most common cause of lymphedema, responsible for 41.8% of lower extremity lymphedema cases.

While cancer has historically been considered to be the most common cause of lower extremity lymphedema, the findings of this study highlight the potential large population of patients with phlebolymphedema and the need for further research and increased awareness of this condition. *Importantly, the researchers of this study suggested that the prevalence of phlebolymphedema is approximately 16 million in the U.S. alone*, citing prior literature estimating that 5% of the population has some skin changes associated with CVI. This implies that the estimated prevalence of lymphedema in the U.S. is considerably larger than previous estimates of 5 million and highlights the need for increased awareness across the medical community to address this much larger, underdiagnosed and underserved patient population.

214.    On April 7, 2020, Tactile filed with the SEC a Form 8-K signed by Moen that attached is a press release, dated April 6, 2020, announcing the Company's 1Q20 financial results for the period ended March 31, 2020. The Company withdrew its 2020 financial outlook and provided a business update on the Company's response to the COVID-19 pandemic. The

Company noted that its 1Q20 total revenue was negatively impacted in March by the COVID-19 pandemic.  Yet, Defendant Mattys was quoted in the press release underscoring the lymphedema market available for its products:

> As most of our clinician customers practice outside of the hospital, they can respond to patient requests for therapy and interact with us virtually. To date, our supply chain has been functioning well, and we have multiple safeguards in place designed to satisfy future demand for our products. Finally, we expect COVID-19 will continue to impact our near-term financial results; however, we remain confident in our *long-term opportunity related to the $5+ billion U.S. lymphedema market* and plan to continue expanding our commercial organization this year to further enhance our growth profile.

215.    On May 4, 2020, Tactile filed with the SEC a Form 8-K signed by Moen that attached a press release of the same date announcing the Company's 1Q20 financial results for the period ended March 31, 2020.  The Company reported:

> The increase in revenue was attributable to an increase of $4.5 million, or 13%, in sales and rentals of the Flexitouch system and an increase of $1.6 million, or 45%, in sales and rentals of the Entre system in the quarter ended March 31, 2020. The overall revenue increase was largely driven by the continued expansion of our salesforce, increased physician and patient awareness of the treatment options for lymphedema, broad in-network coverage with national and regional insurance payers and *growth in the number of Medicare patients served*.

216.    The press release also reiterated Defendants' conclusions regarding the increased prevalence of lymphedema:

> The new study suggests that the prevalence of lymphedema due to CVI is *approximately 16 million individuals in the United States*. This, in addition to the estimated five million individuals living in the U.S. with cancer-related and primary lymphedema, *increases the total prevalence estimates four-fold to over 20 million individuals*.

217.    Defendant Mattys was also quoted in the press release underscoring the growing lymphedema market:

> While we are not currently able to predict the extent to which the COVID-19 crisis will impact our business over the near term, *we remain confident in our long-term opportunity related to the growing $5+ billion U.S. lymphedema market*.

218.    On the same day, the Company hosted an earnings conference call for investors.

Defendant Mattys continued to emphasize the size the lymphedema market:

> We remain confident in our long-term prospects. Lymphedema is a chronic and progressive condition, which *represents a $5 billion-plus market opportunity* with over 1.3 million patients diagnosed last year. February study published in the Journal of Vascular Surgery: Venous and Lymphatic Disorders, suggested that *chronic venous insufficiency induced lymphedema afflicts as many as 16 million individuals in the United States*.

219.    Contrary to Tactile's bragging about the potential market, Tactile's own Chief Medical Officer authored an article advising that the incidence rate of lymphedema was six times smaller than reported by Defendants in 2018, which would result in TAM "at least three times smaller than Defendants reported."  Accordingly, Defendants' various TAM statements identified herein were materially false and misleading.

## B.    Tactile's 10-Ks and 10-Qs Signed By Director Defendants Were Materially False and Misleading

220.    On February 28, 2019, Tactile filed with the SEC Annual Report on Form 10-K for the year ended December 31, 2018 ("2018 Form 10-K"), which finally disclosed the Qui Tam Action:

> From time to time, we are subject to various claims and legal proceedings arising in the ordinary course of business. Regardless of outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

> On February 13, 2019, we were served with a sealed amended complaint venue in the United States District Court in the Southern District of Texas, Houston Division, captioned *United States ex rel Veterans First Medical Supply, LLC vs. Tactile Medical Systems Technology, Inc.,* Case No. 18-2871, which had been filed on January 23, 2019. The complaint is *qui tam* action on behalf of the United States brought by one of our competitors.  The United States has declined to intervene in this action. *The complaint alleges that we violated the Federal Anti-Kickback Statute claiming that we submitted false claims and made false statements in connection with the Medicare and Medicaid programs, and that we engaged in unlawful retaliation in violation of the Federal False Claims Act.*  The complaint

seeks damages, statutory penalties, attorneys' fees, treble damages and costs.

221.    Boiler-plate like disclosures in each of Tactile's Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q issued (and signed by the five current director Defendants) during the Relevant Period, misrepresented its sales and marketing practice and the "high risk" to Tactile presented thereby:

> Our direct-to-patient and provider model is composed of a direct sales force, patient training and support, reimbursement capabilities and medical expertise to expand awareness, garner referrals and obtain payment for our products.

> We believe recommendations and support of our products by key opinion leaders can influence market acceptance and adoption. If these key opinion leaders choose to not support our products, our ability to achieve broad market acceptance for our products may be impaired.

> After delivery and when requested by our patient, we coordinate a virtual or at-home visit from one of our licensed, contract trainers to provide education, clinical support or customer service. These trainers are healthcare professionals, licensed in their state of residence, instructed on proper use of our products. Patient visits are coordinated from our offices in Minneapolis and training sessions are assigned by our staff.

> . . .

222.    These filings also misrepresented the risks presented to Tactile from its illegal practices and misrepresented the facts of Tactile's 'pre-filling" practices and illegal referral payment practices.

> In addition, there has been a recent trend of increased federal and state regulation of payments made to physicians. The ACA imposed new reporting and disclosure requirements on device and drug manufacturers for any "transfer of value" made or distributed to prescribers and other healthcare providers.

> We are subject to healthcare fraud and abuse regulation and enforcement by federal and state governments, which could adversely impact our business. Healthcare fraud and abuse and

health information privacy and security laws potentially applicable to our operations include:

- the federal Anti-Kickback Statute, which applies to our marketing practices, educational programs, pricing policies and others by prohibiting, among other things, soliciting, receiving, offering or providing remuneration, whether directly or indirect induce the referral of an individual for (i) the furnishing or the arranging for the furnishing of items or services reimbursable such as Medicare or Medicaid; or (ii) the purchase, lease or order of, or the arrangement or recommendation of the put item or service reimbursable under a federal healthcare program. A person or entity does not need to have actual know to violate it to have committed a violation.

Because of the breadth of these laws and the narrowness of the statutory exceptions and safe harbors available under such laws, it is possible that some of our business activities, including certain sales and marketing practices and financial arrangements, including the provision of stock options as partial compensation for consulting services, with physicians, some of whom use or purchase our products, and other customers, could be subject to challenge under one or more of such laws.

223.    Throughout the Relevant Period, Tactile was obligated under SEC Regulations S-8 and S-K, Item 303 to disclose that the Company's improper sales tactics jeopardized a significant percentage of the Company's reported revenue regarding Tactile's CMS and VA business divisions.  Item 303 requires a reporting entity to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii).

224.    Individual Defendants were aware that these actions, and the other wrongdoing alleged herein, posed considerable uncertainty since they were illegal, and the sales and income they produced were thus unsustainable.  In fact, Individual Defendants stated in their 2019 Form 10-K that "to the extent, we are found to be not in compliance with the AKS or the False Claims

Act," in addition to damages and penalties, "the federal government may also seek exclusion from participation in all federal health care programs." The consequences of violation with the AKS or the False Claims Act, as Individual Defendants were aware, that Tactile may be subject to any penalties, damages, fines, exclusions, curtailment, or restructuring of our operations could adversely affect our ability to operate a business.

225. In addition, Tactile disclosed in its 2018 Form 10-K the purpose of the Federal False Claims Act:

> The Federal False Claims Act provides, in part, that the federal government may bring a lawsuit against any person whom it believes *has knowingly presented, or caused to be presented, a false or fraudulent request for payment from the federal government, or who has made a false statement or used a false record to get a claim paid or to avoid, decrease or conceal an obligation to pay money to the federal government or who has knowingly retained an overpayment*. In addition, amendments in 1986 to the Federal False Claims Act have made it easier for private parties to bring whistleblower lawsuits against companies.

> Although we believe that we are in compliance with the Federal False Claims Act as well as the Civil Monetary Penalties laws, if we are found in violation of the same, penalties include fines ranging from $11,181 to $22,363 for each false claim violation of the Federal False Claims Act and varying amounts based on the type of violation of the Civil Monetary Penalties Law), plus up to three times the amount of damages that the federal government sustained because of the act of that person.

226. Following this statement, Tactile affirmed that the Company "… believe that [they] are in compliance with the Federal False Claims Act."

227. Defendants' illegal sales practices, which included kickbacks to doctors and trainers as well as false claims to federal healthcare programs, created a high risk to Tactile.

228. Additionally, since Medicaid programs and some commercial insurance plans "are frequently influenced by coverage determinations," Medicare's potential decision to exclude Flexitouch coverage could have had even wider consequences. As Defendants recognized in their Forms 10-K: "We believe a reduction or elimination of coverage or reimbursement of our

products by Medicare would likely cause some commercial third-party payers to implement similar reductions in their coverage or reimbursement of our products."

229.    Thus, Individual Defendants' concealment of in and failure to disclose the illegal sales practices, and the risk those practices posed to revenue, rendered a failure to comply with Item 303 because Defendants failed to disclose a known trend or uncertainty that could negatively impact Tactile's revenues and income.

230.    Throughout the Relevant Period, Defendants' issued vehement denials in public statements of the Qui Tam complaint's allegations in its public filings by stating: *"the allegations in the lawsuit are without merit and we intend to vigorously defend against the lawsuit*."

231.    Tactile continuously inflated the potential market for its Flexitouch products.

232.    Tactile made material misrepresentations about the potential market for Flexitouch in its 2018 10-K.  In 2018, Tactile calculated its TAM by multiplying the average cost of a Flexitouch ($4,000) by the number of U.S. lymphedema diagnoses (1.1 million) to arrive at a $4.4 billion TAM. According to its 2018 Form 10-K, Tactile had commissioned an "analysis of claims data" from which it "estimated" that 1.1 million patients were diagnosed with lymphedema in 2018. [7]  However, these estimates were overstated.

233.    Among other things, Tactile's 2018 Form 10-K highlighted their claims data analysis and stated that the company's TAM topped $4.2 billion.

> We estimate that more than five million people in the United States are living with lymphedema. *Based on an analysis of claims data commissioned by us, we estimated that approximately 1.1 million patients were diagnosed with lymphedema during the 12 months ended December 31, 2018.* Based on a similar analysis of claims data commissioned by us, we estimated that there were approximately 700,000 patients diagnosed with lymphedema during the 12 months ended June 30, 2014. This represents a 10.6% average annual increase in the number of patients

---

[7] Tactile's 2019 Form 10-K similarly estimated—based on "an analysis of claims data"—that 13 million patients were diagnosed with lymphedema during the 12 months ending June 30, 2019.

diagnosed with lymphedema over the period from June 30, 2014, to December 31, 2018. *We estimate that the addressable market opportunity for our Flexitouch system exceeds $4.2 billion in the United States, which is based on the number of patients diagnosed with lymphedema and our average selling price per device.*

234.    Contrary to Tactile's bragging, Tactile's own Chief Medical Officer authored an article advising that the incidence rate of lymphedema was six times smaller than reported by Defendants in 2018, which would result in TAM "at least three times smaller than Defendants reported."

235.    Defendants misrepresented Tactile's marketing and sales practices by failing to disclose anything about its referral scheme. Tactile's 2018 Form 10-K made the following statement regarding sales to the VA and Medicare:

> We sell our products either directly to patients or to the Veterans Administration on behalf of patients, who are referred to us by physicians, therapists or nurses. We bill payers, such as private insurers, Medicare, or Medicaid, on behalf of our patients and bill patients directly for their cost- sharing amounts, including any portion of an unsatisfied deductible and any copayments or co-insurance. We bill the Veterans Administration directly for the purchase of our product on behalf of the patient. *Approximately 20% of our revenues in 2018 and 18% of our revenues in 2017 came from the Veterans Administration. Approximately 9% of our revenues in 2018 and 8% of our revenues in 2017 came from Medicare patients*.

236.    In the same vein, Tactile's 2018 Form 10-K made the following statement regarding its Medicare segment:

> Because Medicare criteria is extensive, we have a team dedicated to educating prescribers to help them understand how Medicare policy affects their patients and the medical record documentation needed to meet both [National Coverage Determination] and [Local Coverage Determination] requirements. We maintain open communication with physician key opinion leaders and with Medicare contractors to provide data as it becomes available that could potentially influence coverage decisions. *We also continue to closely monitor our Medicare business to identify trends that could have a negative impact on certain Medicare patients' access to our products*, which in turn could have an adverse effect on our business and results of operations.

237.    The 2018 Form 10-K purported to provide "warnings" regarding the federal AKS and Self-Referral Laws:

The Federal Anti-Kickback Statute applies to certain arrangements with healthcare providers, product end users and other parties, including marketing arrangements and discounts and other financial incentives offered to our clinicians in connection with the sales of our products. *Although we believe that we have structured such arrangements to be in compliance with the Anti-Kickback Statute and other applicable laws, regulatory authorities may determine that our marketing, pricing, or other activities violate the Federal Anti-Kickback Statute or other applicable laws*. Noncompliance with the Federal Anti-Kickback Statute can result in civil, administrative and criminal penalties, restrictions on our ability to operate in certain jurisdictions, and exclusion from participation in Medicare, Medicaid or other federal healthcare programs. In addition, to the extent we are found to not be in compliance, we may be required to curtail or restructure our operations. Any penalties, damages, fines, exclusions, curtailment or restructuring of our operations could adversely affect our ability to operate our business, our financial condition and our results of operations.

The Ethics in Patient Referrals Act, commonly known as the "Stark Law," prohibits a physician from making referrals for certain "designated health services" payable by Medicare to an entity, including a company that furnishes durable medical equipment, in which the physician or an immediate family member of such physician has an ownership or investment interest or with which the physician has entered into a compensation arrangement unless an exception applies. Violation of the Stark Law could result in denial of payment, disgorgement of reimbursements received under a noncompliant arrangement, civil penalties and exclusion from Medicare or other governmental programs. *Although we believe that we have structured our provider arrangements to comply with current Stark Law requirements, these requirements are highly technical and there can be no guarantee that regulatory authorities will not determine or assert that our arrangements do not meet applicable Stark Law exceptions*.

Additionally, because some of these laws continue to evolve, we lack definitive guidance as to the application of certain key aspects of these laws as they relate to our arrangements with providers with respect to patient training. We cannot predict the final form that these regulations will take or the effect that the final regulations will have on us. As a result, our provider arrangements may ultimately be found to be non-compliant with applicable federal law.

238.    In addition, on February 26, 2020, Tactile filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2019 ("2019 Form 10-K"). The 2019 Form 10-K was signed by all directors and also by executive officers Mattys and Moen. It substantially repeated the material misinterpretations in the 2018 10-K.

239.    The 2019 Form 10-K stated the following regarding revenue growth:

Revenue increased $34.5 million, or 32%, to $143.8 million in the year ended December 31, 2018, compared to $109.3 million in the year ended December 31, 2017. The growth in revenue was attributable to an increase of approximately $31.6 million, or 31%, in sales and rentals of our Flexitouch system and an increase of approximately $2.9 million, or 32%, in sales and rentals of our Entre and Actitouch systems in the year ended December 31, 2018. The increase in Flexitouch system sales was largely driven by expansion of our sales force, increased volume due to a new contract with a large private insurer, the launch of the Flexitouch Plus product, our third- generation Flexitouch product, and *sales growth in the Veterans Administration channel*.

240.    Tactile's 2019 Form 10-K made the following statement regarding its Medicare

segment:

Because Medicare criteria is extensive, we have a team dedicated to educating prescribers to help them understand how Medicare policy affects their patients and the medical record documentation needed to meet both [National Coverage Determination] and [Local Coverage Determination] requirements. We maintain open communication with physician key opinion leaders and with Medicare contractors to provide data as it becomes available that could potentially influence coverage decisions. *We also continue to closely monitor our Medicare business to identify trends that could have a negative impact on certain Medicare patients' access to our products*, which in turn could have an adverse effect on our business and results of operations.

241.    Tactile's 2019 Form 10-K also reported on its TAM:

Based on a study performed by Dr. Steven Dean et al., it is estimated that more than 16 million people in the United States are living with lymphedema due to CVI. This, in addition to the estimated five million individuals living in the U.S. with cancer-related and primary lymphedema, increases the prevalence estimates four-fold to over 20 million individuals. In order to more accurately target patients actively looking for a treatment option, we have performed an analysis of claims data. *We estimated that approximately 1.3 million patients were diagnosed with lymphedema during the 12 months ended June 30, 2019*. Based on a similar analysis of claims data commissioned by us, we estimated that there were approximately 1.1 million patients diagnosed with lymphedema during the 12 months ended June 30, 2018. This represents an 18% year-over-year increase in the number of patients diagnosed with lymphedema in a one-year period. *We estimate that the addressable market opportunity for our Flexitouch system exceeds $5.0 billion in the United States, which is based on the number of patients diagnosed with lymphedema and our average selling price per device*.

242.    The 2019 Form 10-K made the following statements regarding violations of the federal AKS and Self-Referral Laws:

> The Federal Anti-Kickback Statute applies to certain arrangements with healthcare providers, product end users and other parties, including marketing arrangements and discounts and other financial incentives offered to our clinicians in connection with the sales of our products. Noncompliance with the Federal Anti-Kickback Statute can result in civil, administrative and criminal penalties, restrictions on our ability to operate in certain jurisdictions, and exclusion from participation in Medicare, Medicaid or other federal healthcare programs. In addition, to the extent we are found to not be in compliance, we may be required to curtail or restructure our operations.

> The Ethics in Patient Referrals Act, commonly known as the "Stark Law," prohibits a physician from making referrals for certain "designated health services" payable by Medicare to an entity, including a company that furnishes durable medical equipment, in which the physician or an immediate family member of such physician has an ownership or investment interest or with which the physician has entered into a compensation arrangement unless an exception applies. Violation of the Stark Law could result in denial of payment, disgorgement of reimbursements received under a noncompliant arrangement, civil penalties and exclusion from Medicare or other governmental programs.

> Additionally, because some of these laws continue to evolve, we lack definitive guidance as to the application of certain key aspects of these laws *as they relate to our arrangements with providers with respect to patient training*. We cannot predict the final form that these regulations will take or the effect that the final regulations will have on us. As a result, our provider arrangements may ultimately be found to be non-compliant with applicable federal law.

243.    The 2019 Form 10-K also made the following statements regarding violations of the False Claims Act:

> *Although we believe that we are in compliance with the Federal False Claims Act as well as the Civil Monetary Penalties laws*, if we are found in violation of the same, penalties include fines for each false claim violation of the Federal False Claims Act and varying amounts based on the type of violation of the Civil Monetary Penalties Law, plus up to three times the amount of damages that the federal government sustained because of the act of that person. In addition, the federal government may also seek exclusion from participation in all federal health care programs.

244.    Defendants Mattys and Moen signed the SOX Certifications that were included in the 2019 Form 10-K.

245.    The statements in the 2018 and 2019 Form 10-K were materially false and misleading and omitted material facts because:

a)    the "growth in the number of Medicare patients served" and the "sales growth in the Veterans Administration channel" highlighted as factors "driv[ing]" the "increase in Flexitouch system sales" were based in part on illegal and unsustainable sale practices involving kickbacks paid to doctors and contract trainers;

b)    the Company's reported revenues were in part the product of illegal sales practices, including engaging in kickback schemes to push Flexitouch sales in the VA and CMS channels and submitting false claims to CMS;

c)    the Company's reported revenues from CMS and the VA were overstated;

d)    the "$4 billion plus opportunity" for Flexitouch sales was overstated by at least three times;

e)    the "addressable market opportunity for our Flexitouch system exceed[ing] $5.0 billion in the United States" was overstated by at least four times;

f)    the reportedly increased estimated lymphedema prevalence in the U.S. by "four-fold to over 20 million individuals" was based merely on a study's report of "skin changes associated with CVI," and CVI does not necessarily develop into lymphedema;

g)    the "close[] monitor[ing]" of the Medicare business "to identify trends that could have a negative impact on certain Medicare patients' access to our products" omitted the Company's ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████

h)    Defendants' stated belief in their compliance with the False Claims Act lacked any basis given the Company's ongoing kickback schemes and submissions of false claims;

i)    Tactile's "arrangements with providers with respect to patient training" violated the AKS, enacted in 1972, and the Stark Law, enacted in 1989;

j)    in violation of Item 303, Defendants failed to disclose that the Company was exposed to an extreme risk of legal and regulatory scrutiny that put nearly 30% of its business related to its VA and CMS channels at risk of exclusion from participating in the federal healthcare programs; and

k)    Defendants had failed to design internal controls to address the illegal practice alleged herein.

246.    Defendants Mattys, Moen, Soderberg, Burke, Huggenberger, Nigon, Pegus and Roche signed the 2020 Form 10-K, which repeated substantially the same materially false and misleading information, and which approved Tactile's 2018 10-K and 2019 10-K causing loss and damage to Tactile.

C.    **The Proxy Statements For Annual Meetings Held During The Relevant Period In 2018, 2019 And 2020 Were Materially False And Misleading**

247.    On March 27, 2018, Tactile was caused to issue a Proxy Statement for its annual meeting of stockholders to be held on May 10, 2018.  It was signed by Defendant Mattys. The purpose of the meeting was to elect seven directors, i.e., Defendants Burke, Huggenberger, Mattys, Nigon, Pegus, Roshe and Soderberg.  The Proxy contained a "Board of Director's Recommendation" section wherein shareholders were advised "The Board of Directors recommends that shareholders vote for the election of each of our director nominees listed above."  That section failed to provide any rationale for the recommendation, although in each

director's biography in the Proxy it was stated for each director that the directors prior experience qualify them to serve on the board.

248.    On March 26, 2019, Tactile was caused to issue a Proxy Statement for its annual meeting of shareholders to be held May 9, 2019.  It was signed by Defendant Mattys.  The purpose of the meeting was, among other proposals, to vote to elect seven directors, i.e., Defendants Burke, Huggenberger, Mattys, Nigon, Pegus, Roshe and Soderberg, once again, as in 2018, the Proxy informed stockholders that Tactile's "Board of Directors" recommends a vote for all nominees for election as directors.   The Proxy failed to provide any explanation for the recommendation except to state that each director prior experience qualified that director to serve on Tactile's Board.

249.    On March 24, 2020, Tactile was caused to issue a Proxy Statement for its annual meeting of shareholders to be held on May 7, 2020.  The purpose of the meeting was, among other proposals, to elect seven directors i.e., Defendants Burke, Huggenberger, Mattys, Nigon, Pegus, Roshe and Soderberg to the Board.  The Proxy was signed by Defendant Mattys.  The Proxy informed shareholders that the Board recommended that shareholders re-elect the same members to the Board - 2020 as in 2018 and 2019. No reasons were given for the recommendation.

250.    All of these Proxies contained the following materially false and misleading statement:

**RISK OVERSIGHT**

"Our Board of Directors oversees the management of risks inherent in the operation of our business and the implementation of our business strategies. Our Board of Directors perform this oversight role by using several different levels of review. In connection with its reviews of the operations and corporate functions our company, our Board of Directors adduces the primary risk associated with the operations and corporate functions. In addition, our Board reviews the risk associated with our company's business strategies periodically throughout

the year as part of its consideration of undertaking any such business strategies."

"Each of our Board Committees also coordinates oversight of the management of our risk that falls within the Committee's area of responsibility. In performing this function, each Committee has full access to management as well as the ability to engage advisors."

251.    This representation was false each time it was made in the Proxies because it failed to disclose that the Tactile's Board ignored its oversight duties and/or had no systems or procedures to oversee risk and/or the Board will not curtail Tactile's illegal referrer schemes.

## VIII.    INSIDER SELLING

252.    Months before the wrongdoing was fully understood by the market, Defendants Burke, Nigon, Roche, Mattys, Rishe, Blake and Folkes ("the Insider Selling Defendants") sold tens of thousands of shares while in possession of material non-public information regarding the Company's business growth for approximately $38 million.

253.    The Insider Trading Defendants were experienced investors that were well aware of the prohibitions against insider trading.  Tactile's insider trading policy recognizes that "[f]ederal and state securities laws prohibit individuals from trading in the securities of a company while they are aware of material information about that company that is not generally known or available to the public." Notably, the policy informs Tactile insiders that information concerning "[s]ignificant litigation exposure due to actual or threatened litigation" is material information on which the insiders are prohibited from trading.

254.    In the Securities Class Action, this Court held that the "unusual" number of insiders who made "significant proportions of stock sales" are indicative of a "strong inference of scienter." Order at 43-49.

255.    While some stock sales may have been made pursuant to various 10b5-1 plans for the respective Insider Selling Defendants, 10b5-1 plans do not provide a defense or immunity if

the plan was adopted while the seller was in possession of material non-public information or made the sale in bad faith as is alleged here.

256.    This is especially true here because certain Insider Selling Defendants amended their 10b5-1 plans months before unveiling the Qui Tam Action in Tactile's 10-K.  While amendments to Rule 10b5-1 plans may be permitted as long as the modifier does not possess material non-public information at the time of the modification and meets all of the elements required at the inception of the plan, modifications should be avoided if they create the perception that the person is manipulating the plan to benefit from material non-public information, jeopardizing the good faith element and the availability of the affirmative defense.  As a result, Rule 10b5-1 plans should be modified rarely and should be designed to prevent the need for amendment.

257.    Defendant Burke sold a total of 16,000 Tactile shares, while the price of the Company's stock was artificially inflated for approximately $924,961 in proceeds, while in possession of material, non-public information.  As a member of both the Board's Compliance Committee and its Audit Committees, Defendant Burke knew the truth about (i) the kickback scheme and the False Claims Act violations, (ii) the Company's fabricated positive statements regarding its revenue growth, (iii) total addressable market, and (iv) the merits of the Qui Tam Action and traded on such basis. Burke's sales constituted 74.04% of his Tactile stock during the Period.

258.    Defendant Nigon sold 26,000 Tactile shares, while the price of the Company's stock was artificially inflated for approximately $1,343,375 in proceeds while in possession of material, non-public information.  As a member of the Board's Compliance Committee and Chairman of the Audit Committee, Defendant Nigon knew the truth about (i) the kickback

scheme and the False Claims Act violations, (ii) the Company's fabricated positive statements regarding its revenue growth, (iii) total addressable market, and (iv) the merits of the Qui Tam Action and traded on such basis. Nigon's sales constituted 59.05% of his Tactile stock during the Period.

259.    Defendant Roche sold 50,000 Tactile shares, while the price of the Company's stock was artificially inflated for approximately $2,608,247, while in possession of material, non-public information.  As a member of the Audit committee and Chairman of the Compliance committee, he was responsible for overseeing the Company's compliance and risk management processes, including compliance with anti-kickback laws and the False Claims Act.  Roche sold 56.83% of the Tactile stock during the Period.

260.    Defendant Matty sold 276,000 Tactile shares for approximately $17,534,888 in proceeds during the Relevant Period. Although Defendant Mattys' stock sales may have been executed under a 10b5-1 plan, the plans themselves imply that the insider trading regulations were violated because Mattys adopted his insider trading plan on May 9, 2018, and Tactile was engaged in illegal referral payment schemes, illegal remuneration to doctors from June 2011 through at least May 2018.  Given this timing, it is likely Mattys adopted its 10b5-1 plan to avoid claims of insider trading.

261.    From the time of the amendment to the insider trading policy and before the Qui Tam complaint was unsealed to the public, Mattys sold $8,435,345.00 of Tactile stock, approximately half the stock he sold during the entire two-year Relevant Period.  ███

████████████████████████████████████████████████████

████████████████████████████████████████████████

262.    As a result, Defendant Mattys was in possession of critical, nonpublic information when he made his stock sales during the Relevant Period.

263.    Defendant Folkes sold 64.4% his Tactile stock during the Period <u>outside</u> of his 10b-5-1 plan and reaped over $5.6 million in profits during the Period.

264.    Defendant Rishe sold 133,000 Tactile shares while the price of the Company's stock was artificially inflated for approximately $7,294,280 while in possession of material, non-public information.   As the SVP of Tactile, Defendant Rishe understood these illicit sales activities had contributed to the Company's claimed revenue increase, inflating Tactile's share price.  AKS and False Claims Act violations could cost the Company as much as 30% of its sales, and Defendant Rishe was aware of this risk and recognized that the Qui Tam Action had merit. Rishe sold 76.33 % of his shares throughout the Relevant Period. Although his sales were made pursuant five separate 10(b)(5)-1 insider trading plans, each of the plans adopted during the Relevant Period was adopted while Defendant Rishe was in possession of material, nonpublic information concerning Tactile's fraudulent course of conduct.

265.    Defendant Blake sold 6,000 shares for approximately $347,021 in proceeds following the false and misleading statements in the 1Q18 and 2Q18 earnings announcements. As the Chief Financial Officer, Defendant Blake possessed insider information regarding the Company's fraudulent course of businesses practices regarding the Company's revenue earnings and business growth and traded on such basis. Blake sold 19.43% of his total Tactile stock during the Period.

## IX.    BONUS COMPENSATION THAT SHOULD BE DISGORGED

266.    ███████████████████████████████████████████

███████████████████████████████████████████



267.

268.

269.

270.



271.    In 2018, Defendant Rishe was subject to a separate yearly bonus arrangement. Rishe earned quarterly bonuses under that plan based on her performance against two quotas: (1) a quarterly revenue quota and bonus for meeting Flexitouch shipment quotas ("Revenue Quota"), and (2) a quarterly quota based on the number of units sold into the Veterans Administration system ("VA Quota"). Defendant Rishe might receive a quarterly incentive ranging from $3,000 if she met the minimum quota to $37,500 if he met the maximum quota under the Revenue Quota. Defendant Rishe earned a quarterly incentive of up to $5,000 if the VA Quota was met to $14,000 if the maximum quota was attained.

272.    Defendant Mattys was selected by the Compensation Committee to create the budgets, quotas, and objectives in Rishe's bonus structure and to assess the Company's performance against them. Rishe received an aggregate bonus of $188,500 under his 2018 incentive compensation plan, or 91.5 percent of the maximum permitted under the plan.

Individual Defendants were incentivized to raise revenue, even though the fraudulent and criminal means were asserted here because revenue performance accounted for 80% of the MIP incentive payouts.

273.    For the fiscal year 2018, 2019 and 2020, each director was awarded $63,499, $124,975 and $129,966 respectively and in 2018 director defendants were each awarded options worth $62,488.

## X.    DAMAGES TO TACTILE

274.    As a direct and proximate result of the Individual Defendants' conduct, Tactile has and will lose and expend many millions of dollars.

275.    Such expenditures include, but are not limited to, legal fees associated with the federal securities lawsuit filed against the Company, its Chief Executive Officer, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

276.    After the Securities Class Action Order, Tactile was forced to consider settlement negotiations considering the significant litigation risk to the Company.  On February 14, 2023, the Securities Class Action Plaintiff filed a letter stating "[i]n accordance with the Court's Stay Order dated November 29, 2022 (ECF 141), Plaintiff respectfully provides the Court with the following update. The parties are continuing to negotiate certain terms of the stipulation of settlement, and expect to file the stipulation of settlement and unopposed motion for preliminary approval of the settlement within 14 calendar days."  This settlement will cost Tactile at least $5,000,000 according to its 2022 10-K filed with the SEC on February 21, 2023 for the year ending December 31, 2022.

277.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

278.    The Individual Defendants should disgorge all performance-based income awarded during or arising out of the Relevant Period.

279.    The Insider Trading Defendants also owe disgorgement to Tactile of all profits.

280.    As a direct and proximate result of the Director Defendants' conduct, Tactile has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Director Defendants' breaches of fiduciary duties.

## XI.    THE DEMAND BOARD WRONGFULLY IGNORED OR REFUSED TO INVESTIGATE THE SECURITIES CLASS ACTION AND THE SECURITIES CLASS ACTION ORDER

281.    Plaintiff brings this action derivatively on behalf of Tactile to redress injuries suffered by the Company as a direct and proximate result of Defendants' misconduct.

282.    Tactile's directors received notice of the Securities Class Action identifying some or all of the misconduct alleged herein on or about September 3, 2020 and received notice of the Securities Class Action Order on or about March 31, 2022.

283.    On February 21, 2023, the Company filed its 2022 10-K with the SEC signed by the entire Demand Board stating with respect to this action "[w]e are defending the action as it proceeds."

284.    At the time the Securities Class Action Order was issued on March 31, 2022 finding that the Securities Class Action had alleged credible, factual allegations of scienter and insider trading, the Demand Board could have investigated whether the factual allegations in the

Securities Class Action had any bearing on issues in this derivative action. However, there is no indication that the Demand Board ever investigated the derivative claims or the Securities Class Action Order. The fact that the Demand Board appears to have taken no action to investigate the Securities Class Action or the Securities Class Action Order as it relates to the derivative allegations here, and the fact that after the Securities Class Action Order Tactile itself joined the motion to dismiss the derivative action here, evidence that the Demand Board prejudged the claims here, is not neutral, and demand is futile.

285.    Since receiving notice of the Securities Class Action and the Securities Class Action Order, Tactile has filed multiple periodic reports with the SEC including, but not limited to, 8-Ks, 10-Qs, and a 10-K. None of these SEC filings reference an investigation or a meeting to consider investigating the misconduct alleged in the Securities Class Action as corroborated by the Securities Class Action Order.

286.    This failure to act in response to the Securities Class Action and the Securities Class Action Order is particularly egregious given the Securities Class Action will soon settle for $5,000,000, further evidencing wrongdoing and futility.

287.    Because conscious inaction is functionally the same as action, it follows that a conscious decision to ignore the Securities Class Action and the Securities Class Action Order supports a similar inference that the Demand Board acted disloyally and in bad faith.

## XII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

288.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

289.    A pre-suit demand on the Demand Board is futile and, therefore, excused. At the time of filing of the original complaint on May 24, 2022, the Board consists of the following

seven directors: Defendants Asbury, Dodd, Jain, Reuvers, Shafer, Huggenberger and Burke. Plaintiff needs only to allege demand futility as to four of these seven Directors.

290.    Demand is excused as to the entire Demand Board because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their actions to defend the *Weaver* action or failure to act to investigate a scheme to make and/or cause the Company to engage in the misconduct, including signing the 2019 10-K, and to make false and misleading statements and omissions of material fact while five directors (mostly former directors) engaged in millions of dollars of insider sales based on material non-public information, all of which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

291.    In complete abdication of their fiduciary duties, the Demand Board did not take a neutral position and failed to investigate the materially false and misleading statements alleged herein, the Securities Class Action, or the Securities Class Action Order.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.  In choosing to ignore the fraudulent scheme, the Demand Board continues to perpetuate this false appearance of a more profitable and attractive investment.  While investors were duped into believing the fraud, five Directors sold Company stock at artificially inflated prices based on inside information and the Demand Board has taken no action to investigate them.  As a result of the foregoing, the Demand Board breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile and thus excused.

## A. **Defendant Burke**

292.    Defendant Burke is not disinterested or independent and therefore, is incapable of considering demand because he served on the Audit Committee... Pursuant to the Audit

Committee's Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, accounting, legal, regulatory, and public disclosure requirements. Thus, Defendant Burke was responsible for knowingly or recklessly allowing the improper statements related to illegal submission of false claims for reimbursement to CMS and overstating its revenues earned from the VA and CMS. Further, Defendant Burke reviewed and approved the improper press releases made to the public. Despite his knowledge or reckless disregard, this Defendant caused these improper statements.

293.    In addition, Defendant Burke engaged in corporate misconduct by violating Tactile's Code of Conduct because he possessed non-public information regarding the supply chain disruption and its impact on the Company's business growth and engaged in self-dealing by trading on such information.

294.    Defendant Burke, while in possession of material non-public information, sold a minimum of 16,662 shares of the Company's stock at various prices per share for a windfall of $924,961 and this sale demonstrates his motive in facilitating and participating in the fraud. As a result of his insider selling, Defendant Burke may be personally subject to disgorgement.

295.    Lastly, Defendant Burke is a defendant in the Securities Action, which seeks to hold him liable for much of the same wrongdoing as is alleged herein.

296.    This lack of independence and financial benefits received by Defendant Burke render him incapable of impartially considering a demand to commence and vigorously prosecute this action.

297.    For these reasons, Defendant Burke breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

### B.  **Defendant Huggenberger**

298.    Defendant Huggenberger is not disinterested or independent and therefore, is incapable of considering demand because he served on the Compensation and Organization Committee during the wrongdoing, and up to the present day. Defendant Huggenberger was charged with evaluating the CEO's performance, and his failure to properly do so makes him especially culpable for the wrongful conduct described herein.  He conducted little, if any, oversight of the Company's performance and shareholder return.  He consciously disregarded his duties to consider a number of factors when assessing the incentive component of executive compensation, including the MIP Program, which incentivized Individual Defendants to raise revenue through fraudulent and criminal means.

299.    In addition, Defendant Huggenberger served on the Compliance and Reimbursement Governance Committee, and as part of his duty, he was required to provide a review, guidance, and oversight for the overall operations of a corporation or business. He failed to review regulatory developments and governance best practices that would best serve the interest of Tactile's shareholders. Good corporate governance leads to ethical business practices, which leads to financial viability. Defendant Huggenberger willfully neglected and failed to ensure the Company's regulatory compliance with the False Claims Act and State and Federal Anti-Kickback Statute.

300.    This lack of independence and financial benefits received by Defendant Huggenberger render him incapable of impartially considering a demand to commence and vigorously prosecute this action.

301.    For these reasons, Defendant Huggenberger breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

## C.  **Reuvers**

302.    Demand Board member Reuvers joined the board on or about May, 22, 2020 and as the Company's CEO is not independent.

## D.  **Dodd**

303.    Demand Board member Dodd joined the board on or about Jan. 5, 2021, a few months after the Securities Action commenced and before the Securities Class Action Order was issued.  Thus, Dodd had ample time to propose an investigation query but SEC filings indicate she did not do so.  Instead, Dodd chose to direct the Company to file a motion to dismiss this action pre-judging the derivative claims here and demand is futile as to Dodd.

## E.  **Jain**

304.    Demand Board member Jain joined the board on or about Jan. 5, 2021, a few months after the Securities Action commenced and before the Securities Class Action Order was issued.  Thus, Jain had ample time to propose an investigation query but SEC filings indicate she did not do so.  Instead, Jain chose to direct the Company to file a motion to dismiss this action pre-judging the derivative claims here and demand is futile as to Jain.

## F.  **Asbury**

305.    Demand Board member Asbury joined the board on or about Jan. 5, 2022, after the Securities Action commenced and months before the Securities Class Action Order was issued.  Thus, Asbury had ample time to propose an investigation query but SEC filings indicate

she did not do so. Instead, Asbury chose to direct the Company to file a motion to dismiss this action pre-judging the derivative claims here and demand is futile as to Asbury.

**G. Shafer**

306.    Demand Board member Shafer joined the board on or about Jan. 5, 2022 after the Securities Action commenced and months before the Securities Class Action Order was issued. Thus, Shafer had ample time to propose an investigation query but SEC filings indicate he did not do so.  Instead, Shafer chose to direct the Company to file a motion to dismiss this action pre-judging the derivative claims here and demand is futile as to Shafer.

**H. Demand Is Excused**

307.    The Directors, as members of the Board, were and are subject to the Code of Conduct.  The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations.  The Code requires the Directors to also adhere to Tactile's standards of business conduct.  The Directors did not comply with the requirements of the Code of Conduct.  The Directors violated the Code because they knowingly or recklessly failed to take action or investigate or engaged in and facilitated the misconduct alleged herein and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  Because at least two of seven current Directors violated the Code of Conduct during the Relevant Period and seven of seven failed to take action and prejudged the derivative claims, they either face a substantial likelihood of liability for breaching their fiduciary duties or and demand upon them is futile.

308.    Furthermore, demand, in this case, is excused because the Demand Board, two of whom are named as defendants in this action, control the Company and are indebted to each other.  The Directors have longstanding business and personal relationships with each other and

the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand upon the Directors would be futile.

309.    Demand against the Demand Board is further excused because the Demand Board itself failed to investigate and take any action with respect to numerous red flags raised by the Securities Class Action and the Securities Class Action Order in violation of their fiduciary duties.

310.    Tactile has been and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. Yet, the Demand Board has not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Tactile any part of the damages Tactile suffered and will continue to suffer, thereby. Thus, any demand upon the Directors would be futile.

311.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

312.    The acts complained of herein constitute violations of fiduciary duties owed by Tactile's Officers and Directors, and these acts are incapable of ratification.

313.    Demand futility is also demonstrated by the fact that the Demand Board has refused to even investigate the many rulings in the Securities Class Action Order.

314.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Tactile. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of Tactile, there would be no directors' and officers' insurance protection.  Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Demand Board is futile and, therefore, excused.

315.    If there is no directors' and officers' liability insurance, then the Demand Board will not cause Tactile to sue the Individual Defendants named herein since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

316.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least four of them, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## COUNT I

### AGAINST CERTAIN DEFENDANTS
### FOR VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT

317.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

318.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  The Section 14(a) claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

319.   Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations at the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

320.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statements shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

321.    Under the direction and watch of the Director Defendants in 2018, 2019 and 2020, the Company's Proxy Statements filed with the SEC in March 2018, 2019 and 2020 (the "Proxy Statements") in which certain director defendants recommended that shareholders vote to elect the director defendants as directors of Tactile failed to disclose, inter alia, the misrepresentations and omissions regarding the foregoing material facts which were material to the Company's shareholders in voting on election of directors to hold office until the next annual meeting of stockholders and until their successors are duly elected and qualified. The Proxy Statement misleadingly recommended that shareholders vote "For" all director-nominees on the 2019 and 2020 slates.

322.    The Company was damaged as a result of these Director Defendants' material misrepresentations and omissions in the Proxy Statements in an amount to be determined at trial, but which should include disgorgement of all performance compensation, director fees and cancellation of all stock and option awards.

323.    Plaintiff on behalf of Tactile has no adequate remedy at law.

## COUNT II

### AGAINST CERTAIN DEFENDANTS TO RESCIND THEIR COMPENSATION UNDER SECTION 29(B) OF THE EXCHANGE ACT

324.    Plaintiff incorporates by reference and realleges each and every preceding allegation set forth above, as though fully set forth herein.

325.    Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b), provides in pertinent part as follows:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder and every contract . . . heretofore on hereafter made the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this chapter or any rules or regulation thereunder, shall be void . . . as regards the rights of any person who in violation

of any such provision, rule or regulation shall have made or engaged in the performances of contract.

326. The principle that corporate contracts can be avoided under the securities laws is well-established, as recognized by the United States Supreme Court in *Mills v. Electric Auto-Lite*, 356 U.S. 375, 386-87 (1970) (footnotes omitted), "This language establishes that the guilty party is precluded from enforcing the contract against an unwilling innocent party."

327. Section 29(b) of the Exchange Act provides equitable remedies that include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

328. These Director Defendants violated the securities laws while performing their duties under various agreements they had with the Company for director services, and the Company is entitled to rescission of those agreements.

329. The Company was and is an innocent party with respect to Director Defendants' Exchange Act violations.

330. Plaintiff, on behalf of the Company, seek rescission of the stock and option awards to the Director Defendants in 2018, 2019 and 2020 due to these defendants' violations of the Exchange Act while performing their job duties.

331. As a result of the foregoing, the Company is entitled to rescission of those awards and/or return of all monies and benefits previously paid thereunder.

## COUNT III

### AGAINST CERTAIN OFFICER DEFENDANTS TO RESCIND THEIR EMPLOYMENT CONTRACT COMPENSATION UNDER SECTION 29(B) OF THE EXCHANGE ACT

332. Plaintiff incorporates by reference and realleges each and every preceding allegation set forth above, as though fully set forth herein.

333.    Exchange Act Section 29(b), 15 U.S.C. § 78cc(b), provides in pertinent part as follows:

> Every contract made in violation of any provision of this chapter or any rule or regulation thereunder and every contract . . . heretofore on hereafter made the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this chapter or any rules or regulation thereunder, shall be void . . . as regards the rights of any person who in violation of any such provision, rule or regulation shall have made or engaged in the performances of contract.

334.    The principle that corporate contracts can be avoided under the securities laws is well-established, as recognized by the United States Supreme Court in *Mills v. Electric Auto-Lite*, 356 U.S. 375, 386-87 (1970) (footnotes omitted), "This language establishes that the guilty party is precluded from enforcing the contract against an unwilling innocent party."

335.    Section 29(b) of the Exchange Act provides equitable remedies that include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

336.    Certain Officer Defendants violated the federal securities laws while performing their duties under various agreements they had with The Company for director services, and the Company is entitled to rescission of those agreements.

337.    The Company was and is an innocent party with respect to the Individual Defendants Exchange Act violations.

338.    Plaintiff, on behalf of the Company, seek rescission of the contracts between these Officer Defendants and the Company due to these defendants' violations of the Exchange Act while performing their job duties.

339.    As a result of the foregoing, the Company is entitled to recission of those agreements and contracts and/or return of all monies and benefits previously paid thereunder.

## COUNT IV

### AGAINST DEFENDANTS MOEN, BLAKE, MATTYS, FOLKES, AND RISHE FOR CONTRIBUTION UNDER 15 U.S.C. § 77 K(F) AND 21D(5)(A)-(D) AND 8 FOR VIOLATIONS OF SECTIONS 10(B) AND 21D OF THE EXCHANGE ACT

340.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

341.    Plaintiff asserts this Count against Moen, Blake, Mattys, Folkes, and Rishe (the "Contribution Defendants") who are named as defendants in the Securities Class Action.  The conduct of these Contribution Defendants, as described herein, has exposed the Company to significant liability under various federal securities laws by their disloyal acts.

342.    The Company is named as a Defendant in the Securities Class Action that alleges acts and conduct which constitute violations of Section 10b5 of the Securities Exchange Act and Section 10(b) of the Exchange Act.  The Company is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein.  These suits have caused the Company to incur substantial costs for defense and settlement.  If the Company is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omission of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts.  The Company is entitled to contribution and indemnification from the Contribution Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

343.    As officers, directors, and otherwise, the Contribution Defendants had the power to ability to, and did, control over influence, either directly or indirectly, the Company's general affairs, including the content of its public statements, and has the power or ability to directly or

indirectly control or influence the specific corporate statements and conduct that violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

344.    The Contribution Defendants are liable under Section 11K(f) of the Securities Act and/or section 21D of the Exchange Act, which provides for claims of contributions from the same of Individual Defendants named herein.

345.    The Contribution Defendants have damaged the Company and are liable to the Company for contribution and/or indemnification. No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## COUNT V

## AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

346.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

347.    The Individual Defendants owed and owe Tactile fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Tactile the highest obligation of loyalty and care.

348.    Certain Individual Defendants and each of them, violated and breached their fiduciary duties as described herein of loyalty and candor by trading on inside information while at the same time causing Tactile to issue materially false and misleading statements in the SEC filings under their control as identified herein.

349.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Tactile has been caused to issue materially false and misleading SEC filings and engaged in "high risk" illegal marketing practices and Tactile has sustained significant

damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

350.    Plaintiff, on behalf of Tactile, has no adequate remedy at law.

## COUNT VI

### AGAINST CERTAIN INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT AND BREACHES OF FIDUCIARY DUTIES

351.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

352.    Plaintiff brings this claim for disgorgement to Tactile of compensation paid to officers and directors for service during the Relevant Period and/or disgorgement of insider trader profits under theories of liability of fiduciary breach and/or unjust enrichment.

353.    By their wrongful acts and omissions, certain Individual Defendants were unjustly enriched at the expense of and to the detriment of Tactile. These certain Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Tactile.

354.    Further, the Insider Selling Defendants sold Tactile stock while in possession of material, nonpublic information that artificially inflated the price of Tactile stock. As a result, the Insider Selling Defendants profited from their fiduciary breaches and owe disgorgement to Tactile. The Insider Selling Defendants were unjustly enriched through their exploitation of material and adverse inside information and should be ordered to return all gains.

355.    Plaintiff, as a stockholder and representative of Tactile, seeks restitution from the Insider Selling Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

356.    Plaintiff, on behalf of Tactile, has no adequate remedy at law.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law and demand is excused;

B.    Awarding, against all Director and Officer Defendants and in favor of the Company, the return of all officer compensation and directors' stock and option awards to the Company;

C.    Awarding to the Company as rescissory damages under Section 29(b) of the Exchange Act all compensation and stock and option awards arising out of their contracts subject to Section 29(b) as alleged herein and voiding such contracts and eliminating any continuing liability of the Company to any parties thereto;

D.    Disgorgement of insider trading profits from the Insider Selling Defendants, and from their affiliates;

E.    Awarding the Company judgment against the Individual Defendants and/or on the contribution claims asserted herein;

F.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

i.    a provision to control insider selling;

   ii. a provision to require the disclosure of when 10b5-1 trading plans are entered into or amended; and

   iii. a proposal to strengthen the Company's oversight of its disclosure procedures.

  G. Awarding punitive damages;

  H. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

  I. Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

  Plaintiff hereby demands a trial by jury.

Dated: March 6, 2023

**OF COUNSEL:**

**SQUITIERI & FEARON, LLP**
Lee Squitieri
305 Broadway, 7th Floor
New York, NY 10007
Telephone: (212) 421-6492

**MOORE KUEHN, PLLC**
Fletcher Moore
Justin Kuehn
30 Wall Street, 8th Floor
New York, NY 10011
Telephone: (212) 709-8245

**RIGRODSKY LAW, P.A.**

*/s/ Seth D. Rigrodsky*
Seth D. Rigrodsky (#3147)
Gina M. Serra (#5387)
Herbert W. Mondros (#3308)
300 Delaware Avenue, Suite 210
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
sdr@rl-legal.com
gms@rl-legal.com
hwm@rl-legal.com

*Attorneys for Plaintiff*